**IN THE UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**NORFOLK SOUTHERN RAILWAY COMPANY,**
                **Plaintiff,**
**v.**                                                        **Civil Action No. _____**

**RAILWORKS MAINTENANCE OF WAY, INC.,**
                **Defendant**

## COMPLAINT

The Plaintiff Norfolk Southern Railway Company ("**NSRC**"), for its Complaint against Defendant RailWorks Maintenance of Way, Inc. ("**RailWorks**"), alleges and avers as follows:

### PARTIES

1.  NSRC is a Virginia corporation having its principal place of business in Atlanta, Georgia.  At all times material to the events giving rise to NSRC's claims against RailWorks in this case, NSRC's principal place of business was in Norfolk, Virginia.

2.  RailWorks is a Delaware corporation having its principal place of business in New York, New York.

### JURISDICTION AND VENUE

3.  This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332, because the parties are completely diverse and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

4.  On or about April 1, 2017, NSRC and RailWorks entered into an enforceable contract titled "Service Contract for Work on or about Railway's Right of Way," Contract No. 1440004470, Vendor No. 200010357, a redacted copy of which is attached to this Complaint as **Exhibit A** ("Welding Contract").

5.  The Welding Contract, at § 5.17, provides that RailWorks:

I-1847464.1

(i) consents to the personal jurisdiction of . . . the U.S. District Court for the Eastern District of Virginia . . . in the event any dispute arises out of this Welding Contract or the transactions contemplated by this Welding Contract . . . and (iii) agrees that any action relating to this Welding Contract or the transactions contemplated hereby shall be brought exclusively in the [Eastern District of Virginia].

6. This action involves disputes arising out of, or relating to, RailWorks' "Work" under the Welding Contract. Specifically, NSRC's claims in this case arise from, and are based on, thermite welds performed by RailWorks under the Welding Contract.

7. This Court possesses personal jurisdiction over RailWorks because RailWorks has expressly consented to such jurisdiction pursuant to § 5.17 of the Welding Contract.

8. Venue is proper in this Court, because RailWorks has consented to this Court as the proper venue for all disputes arising out of, or relating to the Welding Contract, pursuant to § 5.17 of the Welding Contract.

9. The Welding Contract further provides that:

EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS CONTRACT OR THE ACTIONS OF ANY PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT HEREOF.

Welding Contract, § 5.17 (emphasis in original)

## FACTUAL BACKGROUND

10. The facts of this case involve two separate incidents in which NSRC trains derailed as a result of improper and defective thermite welds performed by RailWorks. The first incident occurred on January 6, 2019 in or near Bartow, Jefferson County, Georgia (the "Bartow Derailment"). As a result of the Bartow Derailment, NSRC incurred costs, expenses and damages inclusive of interest and to-date attorneys' fees in excess of Thirteen Million Three Hundred Thousand Dollars ($ 13,300,000.00). The second incident occurred on or about May 6, 2019 in or

2

near Woodville, Jackson County, Alabama (the "Woodville Derailment"). As a result of the Woodville Derailment, NSRC incurred costs, expenses and damages inclusive of interest and to-date attorneys' fees in excess of Two Million Nine Hundred Fifty Thousand Dollars ($ 2,950,000.00).

11. NSRC is a national transportation company that operates on approximately nineteen thousand five hundred (19,500) miles of track in twenty-two (22) states and the District of Columbia.

12. In general, all railroad track (including NSRC's track) consists of three basic components. The first is the roadbed on which the track structure is placed or constructed. The primary component of the roadbed is "ballast," which typically consists of crushed rock. To meet the requirements promulgated by the Federal Railroad Administration ("FRA"), the ballast must "transmit and distribute the load of the track and railroad rolling equipment to the subgrade," "restrain the track laterally, longitudinally, and vertically" under the loads and stress exerted by passing trains, "provide adequate drainage for the track" and "maintain proper track crosslevel, surface and alinement." 49 C.F.R. § 213.103.

13. The second component is railroad crossties. Crossties must be made of "material to which rail can be securely fastened," typically treated wood. 49 C.F.R. § 213.109(a). Crossties must be placed at intervals along and under the track such that rails, when fastened to them, will hold and maintain standard or expected gage, surface and alinement, 49 C.F.R. § 213.109(b)(1), as well as distribute the weight of trains over the roadbed. 49 C.F.R. § 213.109(b)(2). The higher the maximum allowable speed for a particular segment of track, the more crossties per segment the track must have. 49 C.F.R. § 213.109(b)(4).

14.     The third component is rail.  The two primary types of rail are jointed rail and welded rail.

15.     Jointed rail consists of segments of rail up to 400 feet in length that are connected at the rail ends or "joints" by bolted fasters called joint bars.  49 C.F.R. § 213.121.  When a rail car passes over a rail joint, the friction between the rail car wheels and the rail ends creates the "clickety-clack" sound commonly associated with moving trains.

16.     Welded rail, also known as continuous welded rail ("CWR"), consists of rail segments of over 400 feet in length that are typically connected at the joints through some form of weld.  Because welded joints significantly decrease friction between the rail and rail cars, CWR requires less track maintenance and results in less wear-and-tear on rail cars.  If correctly installed and maintained, CWR allows trains to move at greater maximum allowable speeds under the FRA's Track Safety Standards, 49 C.F.R. Part 213, and with greater efficiency over such rail.  This case involves CWR.

17.     A segment of track made up of CWR is maintained to account for expansion and contraction caused by variations in temperature.  As temperatures fall, CWR can contract causing, among other things, narrowed gage within the track and increased stress on the track components. As temperatures rise, CWR can expand causing, among other things, a widening of track gage and changes in the tracks surface and alinement. As part of a railroad's track maintenance, segments of rail are periodically added to or removed from CWR to address the impact of temperature and other factors on the track and track structure.

18.     Although NSRC employs welding crews to perform many of the welds necessary to construct and maintain its CWR, NSRC also contracts with contractors such as RailWorks to

4

provide specialized welding services given the significant number of track miles that must be maintained and the large number of rail welds that must be made and/or replaced each year.

19.     The FRA requires that railroads like NSRC prepare and submit a written CWR plan with the FRA Associate Administrator for Railroad Safety/Chief Safety Officer which governs "the installation, adjustment, maintenance and inspection of CWR joints" along with "a training program for the application of those procedures."  49 C.F.R.  § 213.118(a).  Among other things, the CWR must include procedures and desired temperatures for CWR installation and adjustment after installation, requirements anchoring or fastening of CWR, procedures for joint installation in CWR, procedures for cutting and installing new rail in CWR once an issue such as tight track, track buckle or pull apart is discovered, and requirements and procedures for periodic inspection of CWR.  49 C.F.R. Part 213.119.  Once approved by the FRA, NSRC's employees and contractors such as RailWorks must follow and comply with such procedures in constructing, maintaining and inspecting CWR.

**I.      RailWorks' Welding Contract With NSRC**

20.     According to its website, RailWorks is "North American's leading track and transit system experts," and its "most experienced rail contractor."[1]  RailWorks provides a broad array of railroad track construction and maintenance services, including track and roadbed undercutting, rail and crosstie replacement, rail grinding, track inspection services, track signal and communications systems support and repair, track geometry analysis services, and training services for employee engaged in railroad track construction, maintenance and repair.  As it relates

---

[1] https://www.railworks.com/ (last visited January 4, 2022); https://www.railworks.com/services (last visited January 4, 2022).

I-1847464.1

to this case, RailWorks also provides field welding services consisting of "[t]hermite and electric welding from the industry's most experienced technicians."[2]

21.     Thermite welding, also known as exothermic (heat-generating) welding, uses molten metals to permanently join two pieces of rail.  Generally, to perform a thermite weld, the welder must first pre-heat the ends of the "parent" or "native" rail to specified temperature.  A mold is then placed around the rail ends and the gap between them.  A crucible or "kit" containing a mixture of high energy materials (thermite) is then placed over the mold and ignited.  When the molten mixture is placed into the mold, it combines with the "parent" rail to form solid metal in place of the gap.

22.     When a thermite weld is performed in accordance with the required specifications and tolerances, the completed weld has a mechanical strength that typically exceeds other types of welds and has resistance to corrosion.  A properly completed thermite weld will safely allow rail traffic to pass over it for several years after its completion under normal operating conditions.

23.     Relying on RailWorks' representations as to its capabilities and expertise, in 2016 NSRC began discussions and negotiations with RailWorks with respect to RailWorks potentially providing third-party contract rail welding services to NSRC.  As a result of those negotiations, NSRC and RailWorks entered into the Welding Contract on or about April 1, 2017.  The initial term of the Welding Contract was for a period of three years.  After the initial term, the Welding Contract would be automatically extended for successive one year time periods unless terminated by either party.  Welding Contract, Ex. A at § 1.3.

24.     At the time that the thermite welds giving rise to the Bartow Derailment and the Woodville Derailments were performed, the Welding Contract remained in effect, and RailWorks

---

[2] https://www.railworks.com/services/field-welding (last visited January 4, 2022).

6

was obligated to perform such welds in accordance with the terms and specifications of the Welding Contract.

25.     Under the terms of the Welding Contract, RailWorks would perform thermite welds for NSRC as an independent contractor.   As the parties agreed in the Welding Contract, "Contractor shall be solely responsible for, and Railway shall not participate in, the employing or supervising of each person engaged in discharging Contractor's responsibilities under this Contract . . . ."  Welding Contract, § 5.8.

26.     In entering into the Welding Contract, RailWorks represented and warranted that:

> Contractor represents that it has, by careful examination, satisfied itself as to the nature and location of the Work, the character, quality and quantity of materials to be encountered, the character of equipment and facilities needed before and during the prosecution of the Work, the general and local conditions, and all other matters that can in any way affect the Work.

Welding Contract, § 2.1

27.     For all work that it would provide and perform under the Welding Contract, including but not limited to the thermite welds, RailWorks contracted and agreed that it would perform and provide completed thermite welds and other work to NSRC that would meet specific quality and performance criteria.  Specifically:

> Contractor [RailWorks] warrants that it shall perform and complete the Work in a safe, efficient and workmanlike manner strictly in accordance with the requirements of this Contract and that all Persons performing Work on behalf of Contractor shall have all training, licenses and/ or certifications (collectively, "Training") as may be necessary or desirable to perform the Work . . . . Contractor warrants that any equipment used in performing the Work shall be in good working condition and repair and suitable for the Work. ***Contractor warrants that the Work shall be free of defects and imperfections, and fully suitable for the use and purposes for which each and every piece and part is intended, for a period not less than one year after the date on which the Engineer certifies that the Work has been completed.***  The foregoing warranties shall not be exclusive or relieve Contractor of, or create any time or other limitation with regard to, any other warranty or duty created or implied by law, including those with regard to merchantability, fitness and design.

7

I-1847464.1

Welding Contract § 2.3 (emphasis added).  Attachment A to the Welding Contract, entitled General Conditions, makes clear that the "Work" under the Welding Contract consists of Thermite Welding.[3]

28.     Pursuant to the terms of Section 2.3 of the Welding Contract, RailWorks warranted that each thermite weld that it performed and completed for NSRC would meet at least three specific criteria for a period of not less than one year:

    a.   That each thermite weld would be free of defects.

    b.   That each thermite weld would be free of imperfections; and

    c.   That each thermite weld would be fully suitable for the use and purposes for which "each and every piece or part is intended . . . ."

29.     In the specific context of thermite welds, RailWorks warranted under the Welding Contract that each weld would operate to safely carry or convey train traffic over it during the applicable warranty period ("at least one year.").

30.     Attachment A to the Welding Contract entitled "General Conditions" identified specific General Conditions intended to "govern Railway and Contractor during the term of this Contract."  Under the heading of "Thermite Welding," the parties agreed in paragraph 1 that "Contractor will perform thermite welding for Railway as designated and in accordance with specifications approved by Railway.  This work shall, at all times, be subject to the inspection and approval of a Railway officer."

31.     Under the same heading of "Thermite Welding," the parties further agreed in paragraph 6 that "Railway will supply the welding kits, specified tools and consumables." A table

---

[3] The General Conditions to the Welding Contract also provide that the Work to be performed could also include electric welding for track maintenance.  However, no electric welding was involved with respect to the events giving rise to the Bartow or Woodville Derailments.

I-1847464.1

identifying the specific items to be provided by NSRC and RailWorks and used in the performance of Thermite Welds under the Welding Contract is contained in Attachment A, General Conditions under the Heading of "Thermite Welding."

32.    To clearly allocate any risk associated with or arising from the General Conditions to the Welding Contract, the Welding Contract, and the allocation of responsibility for providing materials to be used in the performance of the Welding Contract, the parties specifically provided and agreed in § 2.5 of the Welding Contract that "Contractor shall be responsible for and assumes **all** risk of loss in connection with material furnished by Contractor and material delivered to Contractor by Railway."  (emphasis added). This provision was, and is, specifically applicable to RailWorks warranty obligations and all of its obligations under the Welding Contract.

33.    In § 5.1 of the Welding Contract, RailWorks contracted and agreed to indemnify NSRC and hold it harmless with respect to liability, claims, suits, judgments, costs and expenses arising from its work under the Welding Contract, including but not limited to its performance and provision of thermite welds to or for NSRC.  Specifically, RailWorks covenanted and agreed that:

  (a)  **Contractor shall indemnify and hold harmless [NSRC]** from and against any and all liability, damages, claims, suits, judgments, costs and expenses (including litigation costs, investigation costs, reasonable attorney fees, environmental clean-up costs . . .), fines, penalties, and losses arising out of:

    . . . .

    (i)(B) . . . . any actual or alleged loss of life of or personal injury to any person or the loss of or damage to any property arising out of the negligent acts or omissions or willful misconduct of [RailWorks], except to the extent that the property loss or damage or personal injury or death was caused by the negligence or intentional misconduct of [NSRC].

    . . . .

    (iii)    any alleged violation of any law, statute, code, ordinance or regulation of the United States or of any state, county or municipal government (including those relating to air, water, noise, solid waste and

> other forms of environmental protection, contamination or pollution . . .) to the extent it results from the activities of [RailWorks] contributing to such violation, regardless of whether such activities, acts or omissions are intentional or negligent, and regardless of any specification by [NSRC] without actual knowledge that it might violate any such law, statute, code, ordinance or regulation . . . .

Welding Contract § 5.1 (emphasis added).

34.     In § 5.18 of the Welding Contract under a heading entitled "Governing Laws," the parties contracted and agreed that:

> The laws of the Commonwealth of Virginia shall govern the construction and interpretation of this Contract and all right and obligations of the parties under it, except that the legal effect of any indemnity obligation under this Contract for claims arising from personal injury or property damage shall be governed by the law of the state in which that personal injury or property damage occurred.

Welding Contract § 5.18

## II.     The Bartow Derailment

35.     On October 15, 2018, RailWorks completed a series of thermite welds on NSRC's tracks near Bartow, Georgia, pursuant to its obligations under the Welding Contract.

36.     Upon completion of the welds, RailWorks' employees inspected the welds to determine if the welds met all applicable specifications and requirements imposed by the Welding Contract, including but not limited to the quality and performance warranties contained in § 2.3 of the Welding Contract.

37.     RailWorks represented and warranted to NSRC that the welds met all applicable specifications and requirements imposed by the Welding Contract, including but not limited to the quality and performance warranties contained in § 2.3 of the Welding Contract.

38.     Based on its completion and inspection of the welds, RailWorks also represented and warranted to NSRC that the welds contained no apparent defects or any defects discoverable on reasonable inspection.

10

I-1847464.1

39.     Prior to resuming train traffic over the track containing the welds, NSRC also conducted a field inspection of the welds pursuant to the standards imposed and adopted by the FRA and NSRC's standards and procedures adopted and implemented pursuant to FRA regulations.  These inspections indicated that the welds contained no apparent defects or any defects discoverable on reasonable inspection.

40.     Between October 15, 2018 and the time of the Bartow Derailment on January 6, 2019, NSRC conducted all inspections of the track containing the welds required by the FRA but did not discover any defect in, or problem with, the welds.

41.     On January 6, 2019, at or near milepost S 112.98 on NSRC's Georgia Division in or near Bartow, Georgia, one of the welds broke and/or failed as, or after, an NSRC freight train passed over it in the ordinary and reasonable course of NSRC's operations.  As a result of this break/failure, the track and track structure was compromised such that trains could no longer safely pass over the rail containing the broken weld.

42.     Before the break/failure could be discovered, a second train (NSRC train 192G506) approached and passed over the break.  Given the sight distance available to the train's crew, the time of day (night) and other factors, the train could not stop before reaching the track structure that had been compromised by the break in the weld.

43.     As a direct and proximate result of the broken/failed weld, train 192G506 derailed. In total, thirty nine (39) of the train's one hundred and three (103) freight cars derailed.

44.     Among the thirty nine (39) freight cars that derailed were several cars carrying hazardous materials of various types.  Four (4) of the hazardous material-carrying freight cars were damaged to the point that the hazardous materials they were transporting spilled or leaked.  For

11

example, one freight car leaked or released approximately 17,000 gallons of hydrochloric acid, and one freight car leaked or released approximately 15,000 gallons of hydrogen peroxide.

45.     As a result of the derailment, residents living near the derailment area were evacuated and others were required to shelter-in-place for a period of time.  Several residents in and around the derailment area, as well as Norfolk Southern employees, claimed to have suffered and sustained personal injuries as a result of their claimed exposure to hazardous materials leaked or released in connection with the derailment.  Residents impacted by the derailment also claimed to have suffered property damage, annoyance and inconvenience as a result of the derailment.

46.     The impact of the derailment caused significant damage to the train cars and cargo that NSRC was transporting and NSRC's track and roadbed.  As a result of the derailment, NSRC incurred substantial cost and expense in containing the release of hazardous materials caused by the derailment, removing and repairing the damaged freight cars and in repairing its railroad track and roadbed.  NSRC also suffered damage as a result of the loss of use of the track involved in the derailment and as a result of other claims for personal injury asserted against it as a result of the derailment.

47.     The broken/failed weld was a legal and proximate cause of the derailment.

48.     The broken/failed weld was caused by and/or was a result of defects and imperfections in the weld, and the failure of the weld to be fully suitable for the use and purposes for which each and every piece or part was intended for a period of not less than one year.

49.     The broken/failed weld was caused by and/or was a result of RailWorks' negligence in the performance of the tasks necessary to fully, safely, reasonably and prudently prepare a field thermite weld.  These tasks include, but are not limited to, the inspection of the parent and plug rails used in the welds, the preparation of the parent and plug rails, the performance of the tasks

involved in conducting the thermite weld, post-weld preparation and handling of the weld, inspection of the weld, and/or the reporting of any defects or imperfections in the weld to NSRC.

50.     As a direct and proximate result of the Bartow Derailment, NSRC has incurred, at a minimum, the following damages:

| | | |
|---|---|---|
| a. | Destroyed rail cars | $ 1,433,399.00 |
| b. | Environmental charges | $ 5,049,570.71 |
| c. | Damage to lading | $   100,306.72 |
| d. | Train detours | $     29,455.39 |
| e. | Rail car repairs | $ 1,091,806.00 |
| f. | Train delays | $     61,817.94 |
| g. | EPA Agency Charges | $   250,000.00 |

51.     In addition to these sums, NSRC has incurred costs, fees and expenses in connection with obtaining access to the derailment site to investigate and remediate the site, damage to property associated with such access, and settlement of hundreds of third-party and employee claims.

52.     As a result of the Bartow Derailment, NSRC has also incurred attorneys' fees and expert witness fees with respect to the incident, regulatory issues and inquiries, and claims.

53.     Each and every cost, fee, expense, damage or other amount incurred by NSRC in connection with the Bartow Derailment was a potential element of damage that was reasonably foreseeable to RailWorks at the time the Welding Contract was entered into in the event that RailWorks failed to properly perform its contractual and common law duties and obligations with respect to the performance and preparation of thermite welds for NSRC.

III.    **The Woodville Derailment.**

54.    On December 11, 2018, RailWorks completed a series of thermite welds on NSRC's tracks near Woodville, Alabama, pursuant to its obligations under the Welding Contract.

55.    Upon completion of the welds, RailWorks' employees inspected the welds to determine if the welds met all applicable specifications and requirements imposed by the Welding Contracts, including but not limited to the quality and performance warranties contained in § 2.3 of the Welding Contract.

56.    RailWorks represented and warranted to NSRC that the welds met all applicable specifications and requirements imposed by the Welding Contracts, including but not limited to the quality and performance warranties contained in § 2.3 of the Welding Contract.

57.    Based on its completion and inspection of the welds, RailWorks also represented and warranted to NSRC that the welds contained no apparent defects or any defects discoverable on reasonable inspection.

58.    Prior to resuming train traffic over the track containing the welds, NSRC also conducted a field inspection of the welds pursuant to the standards imposed and adopted by the FRA and NSRC's standards and procedures adopted and implemented pursuant to FRA regulations.  These inspections indicated that the welds contained no apparent defects or any defects discoverable on reasonable inspection.

59.    Between December 11, 2018 and the time of the Woodville Derailment on May 6, 2019, NSRC conducted all inspections of the track containing the welds required by the FRA but did not discover any defect in, or problem with, the welds.

60.    On May 6, 2019, at or near milepost S 313.4A on NSRC's Alabama Division in or near Woodville, Alabama, one of the welds broke and/or failed as, or prior to the time that,  NSRC

14

freight train 736AA05 passed over it in the ordinary and reasonable course of NSRC's operations. As a result of this break/failure, the track and track structure was compromised such that trains could no longer safely pass over the rail containing the broken weld.

61.     As a direct and proximate result of the broken/failed weld, train 736AA05 derailed. In total, twenty six (26) of the train's one hundred and thirty (130) freight cars derailed.

62.     The twenty six (26) freight cars that derailed were carrying coal.  As a result of the derailment, coal from the derailed cars was ejected from and/or spilled from the cars onto NSRC's right-of-way and onto the property of adjacent third-party property owners.

63.     The impact of the derailment caused significant damage to the train cars and cargo that NSRC was transporting and NSRC's track and roadbed.  As a result of the derailment, NSRC incurred substantial cost and expense in cleaning up and removing the spilled coal caused by the derailment, removing and repairing the damaged freight cars, and in repairing its railroad track and roadbed.  NSRC also suffered damage as a result of the loss of use of the track involved in the derailment and as a result of other claims for property damage asserted against it as a result of the derailment.

64.     The broken/failed weld was a legal and proximate cause of the derailment.

65.     The broken/failed weld was caused by and/or was a result of defects and imperfections in the weld, and the failure of the weld to be fully suitable for the use and purposes for which each and every piece or part was intended for a period of not less than one year.

66.     The broken/failed weld was caused by and/or the result of RailWorks' negligence in the performance of the tasks necessary to fully, safely, reasonably and prudently prepare a field thermite weld.  These tasks include, but are not limited to, the inspection of the parent and plug rails used in the welds, the preparation of the parent and plug rails, the performance of the tasks

involved in conducting the thermite weld, post-weld preparation and handling of the weld, inspection of the weld, and/or the reporting of any defects or imperfections in the weld to NSRC.

67.     As a direct and proximate result of the Woodville Derailment, NSRC has incurred, at a minimum, the following damages:

| | | |
|---|---|---|
| a. | Destroyed rail cars | $ 1,197,954.00 |
| b. | Clean up expenses – Hulcher | $      62,285.96 |
| c. | Clean up expenses – RJ Corman | $      81,130.65 |
| d. | Damage to lading | $      77,576.87 |
| e. | Train delays | $      34,313.80 |
| f. | Miscellaneous expenses | $ 1,453,261.28 |

68.     In addition to these sums, NSRC has incurred costs, fees and expenses in connection with obtaining access to the derailment site to investigate and remediate the site, damage to property associated with such access and settlement of third-party property damage claims.

69.     As a result of the Bartow Derailment, NSRC has also incurred attorneys' fees and expert witness fees with respect to the incident, regulatory issues and inquiries, and claims.

70.     Each and every cost, fee, expense, damage or other amount incurred by NSRC in connection with the Bartow Derailment was a potential element of damage that was reasonably foreseeable to RailWorks at the time the Welding Contract was entered into in the event that RailWorks failed to properly perform its contractual and common law duties and obligations with respect to the performance and preparation of thermite welds for NSRC.

**IV.     The Tolling Agreements**

71.     On or about February 23, 2021, RailWorks and NSRC entered into two Stipulation and Tolling Agreements, one applicable to the Bartow Derailment and one applicable to the Woodville Derailment.  The Bartow Stipulation and Tolling Agreement is attached hereto as **Exhibit B** and the Woodville Stipulation and Tolling Agreement is attached hereto as **Exhibit C.** Both Tolling Agreements are governed by Virginia law.  Tolling Agreements § 10.

72.     Under the Tolling Agreements, the parties agreed that the tolling period for purposes of the agreements would commence on January 5, 2021 and would expire (unless extended in writing by mutual agreement of the parties) on January 5, 2022.  Tolling Agreements § 1.  For the duration of the tolling period, the parties agreed that "any and all claims and/or causes of action that may or might be asserted by [NSRC] against RailWorks with respect to or arising in any way out of the" Bartow and Woodville Derailments which would otherwise expire during the tolling period would be extended through and including January 5, 2022.  Tolling Agreements § 3.  The parties further agreed that the Tolling Agreements would have no application to any period of limitation that did not otherwise expire during the tolling period.  Tolling Agreements § 14

73.     NSRC has satisfied any and all conditions or requirements under the Tolling Agreements necessary for it to institute and maintain this action.

74.     Under the terms of the Tolling Agreements, each of the claims asserted by NSRC in this Complaint is timely under any and all applicable statutes of limitations, statutes of repose or other applicable limitation period.

**COUNT I:  BREACH OF EXPRESS WARRANTY (BARTOW DERAILMENT)**

75.     NSRC reincorporates and realleges the allegations asserted in the above paragraphs as if they were fully asserted herein.

17

76.     Pursuant to the terms of Section 2.3 of the Welding Contract, RailWorks warranted that each thermite weld that it performed and completed for NSRC would meet at least three specific criteria for a period of not less than one year:

    a.   That each thermite weld would be free of defects.

    b.   That each thermite weld would be free of imperfections; and

    c.   That each thermite weld would be fully suitable for the use and purposes for which "each and every piece or part is intended . . . ."

77.     In the specific context of thermite welds, RailWorks warranted under the Welding Contract that each weld would operate to safely carry or convey train traffic over it during the applicable warranty period ("at least one year.").

78.     RailWorks further warranted that it would perform and complete thermite welds, including the broken/failed thermite weld that caused the Bartow Derailment, in a workmanlike manner in accordance with the requirements of the Welding Contract.

79.     The broken/failed thermite weld that caused the Bartow Derailment contained defects and imperfections and caused the weld to fail as NSRC's freight trains passed over them.

80.     The broken/failed thermite weld that caused the Bartow Derailment was performed and/or provided to NSRC on or about October 15, 2018 and broke/failed in the course of NSRC's normal train operations on or about January 6, 2019.

81.     The broken/failed thermite weld that caused the Bartow Derailment was not performed in a workmanlike manner in accordance with the requirements of the Welding Contract.

82.     NSRC complied with all obligations and duties required of NSRC under the Welding Contract in connection with broken/failed thermite weld that caused the Bartow Derailment and the Bartow Derailment itself.

I-1847464.1

83.     RailWorks breached its obligations under the Welding Contract by performing, providing, and completing the broken/failed thermite weld that caused the Bartow Derailment in a manner and in such a condition that it contained defects.

84.     RailWorks breached its obligations under the Welding Contract by performing, providing, and completing the broken/failed thermite weld that caused the Bartow Derailment in a manner and in such a condition that it contained imperfections.

85.     RailWorks further breached its obligations under the Welding Contract by performing, providing and completing the broken/failed thermite weld that caused the Bartow Derailment that was not fully suitable for the use and purposes for which "each and every piece or part is intended" for a period of not less than one year.

86.     RailWorks breached its obligations under the Welding Contract by performing, providing and completing the broken/failed thermite weld that caused the Bartow Derailment in a workmanlike manner in accordance with the requirements of the Welding Contract.

87.     As a direct and proximate result of RailWorks' breaches of its warranties and obligations under the Welding Contract, the thermite weld responsible for Bartow Derailment broke and/or failed, causing the Bartow Derailment.

88.     As a direct and proximate result of RailWorks' breaches of its warranties and obligations under the Welding Contract as set forth herein, NSRC incurred costs, expenses, damages and fees as set for the above, along with additional costs, expenses, damages and fees to be proven at trial, as a result of the Bartow Derailment.

89.     Each and every cost, expense, damage and fee incurred by NSRC as a result of the Bartow Derailment was reasonably foreseeable to RailWorks should it fail to comply with its obligations under the Welding Contract.

I-1847464.1

90. NSRC is entitled to recover all of its costs, expenses, damages and fees incurred in connection with the Bartow Derailment from RailWorks as a direct and proximate result of RailWorks' failure to fully comply with its obligations under the Welding Contract as they relate to the broken/failed weld that caused the Bartow Derailment.

### COUNT II:  BREACH OF EXPRESS WARRANTY (WOODVILLE DERAILMENT)

91. NSRC reincorporates and realleges the allegations asserted in the above paragraphs as if they were fully asserted herein.

92. Pursuant to the terms of Section 2.3 of the Welding Contract, RailWorks warranted that each thermite weld that it performed and completed for NSRC would meet at least three specific criteria for a period of not less than one year:

    a. That each thermite weld would be free of defects.

    b. That each thermite weld would be free of imperfections; and

    c. That each thermite weld would be fully suitable for the use and purposes for which "each and every piece or part is intended . . . ."

93. In the specific context of thermite welds, RailWorks warranted under the Welding Contract that each weld would operate to safely carry or convey train traffic over it during the applicable warranty period ("at least one year.").

94. RailWorks further warranted that it would perform and complete thermite welds, including the broken/failed thermite weld that caused the Woodville Derailment, in a workmanlike manner in accordance with the requirements of the Welding Contract.

95. The broken/failed thermite weld that caused the Woodville Derailment contained defects and imperfections and caused the weld to fail as NSRC's freight trains passed over them.

96.     The broken/failed thermite weld that caused the Woodville Derailment was performed and/or provided to NSRC on or about December 11, 2018 and broke/failed in the course of NSRC's normal train operations on or about May 6, 2019.

97.     The broken/failed thermite weld that caused the Woodville Derailment was not performed in a workmanlike manner in accordance with the requirements of the Welding Contract.

98.     NSRC complied with all obligations and duties required of NSRC under the Welding Contract in connection with broken/failed thermite weld that caused the Woodville Derailment and the Woodville Derailment itself.

99.     RailWorks breached its obligations under the Welding Contract by performing, providing and completing the broken/failed thermite weld that caused the Woodville Derailment in a manner and in such a condition that it contained defects.

100.     RailWorks breached its obligations under the Welding Contract by performing, providing and completing the broken/failed thermite weld that caused the Woodville Derailment in a manner and in such a condition that it contained imperfections.

101.     RailWorks further breached its obligations under the Welding Contract by performing, providing and completing the broken/failed thermite weld that caused the Woodville Derailment that was not fully suitable for the use and purposes for which "each and every piece or part is intended" for a period of not less than one year.

102.     RailWorks breached its obligations under the Welding Contract by performing, providing, and completing the broken/failed thermite weld that caused the Woodville Derailment in a workmanlike manner in accordance with the requirements of the Welding Contract.

I-1847464.1

103.    As a direct and proximate result of RailWorks' breaches of its warranties and obligations under the Welding Contract, the thermite weld responsible for Woodville Derailment broke and/or failed, causing the Woodville Derailment.

104.    As a direct and proximate result of RailWorks' breaches of its warranties and obligations under the Welding Contract as set forth herein, NSRC incurred costs, expenses, damages and fees as set for the above, along with additional costs, expenses, damages and fees to be proven at trial, as a result of the Woodville Derailment.

105.    Each and every cost, expense, damage and fee incurred by NSRC as a result of the Woodville Derailment was reasonably foreseeable to RailWorks should it fail to comply with its obligations under the Welding Contract.

106.    NSRC is entitled to recover all of its costs, expenses, damages and fees incurred in connection with the Woodville Derailment from RailWorks as a direct and proximate result of RailWorks' failure to fully comply with its obligations under the Welding Contract as they relate to the broken/failed weld that caused the Woodville Derailment.

**COUNT III:  NEGLIGENCE (BARTOW DERAILMENT)**

107.    NSRC reincorporates and realleges the allegations asserted in the above paragraphs as if they were fully asserted herein.

108.    In undertaking to perform thermite welds for NSRC in or near Bartow, Georgia in October of 2018, RailWorks was obligated to exercise care for NSRC's safety, the safety of NSRC's employees and property, and the safety of those individuals and entities whose persons or property were within reasonable proximity to the welds that RailWorks undertook to perform.

109.    In performing the welds that it performed for NSRC in or near Bartow, Georgia in October of 2018, RailWorks was obligated to exercise reasonable and ordinary care, and/or that

I-1847464.1

degree of care that a reasonably prudent professional or similarly situated company would use under the same or similar circumstances in performing the thermite welds.

110.    In performing the broken/failed weld that caused the Bartow Derailment, RailWorks failed to exercise care for NSRC's safety, the safety of NSRC's employees and property and the safety of those individuals and entities whose persons or property were within reasonable proximity to the welds that RailWorks undertook to perform.

111.    In performing the welds that it performed for NSRC in or near Bartow, Georgia in October of 2018, RailWorks failed to exercise reasonable and ordinary care, and/or that degree of care that a reasonably prudent professional or similarly situated company would use under the same or similar circumstances in performing the thermite welds.

112.    The broken/failed weld was caused by and/or the result of RailWorks' negligence in the performance of the tasks necessary to fully, safely, reasonably and prudently prepare a field thermite weld.  These tasks include, but are not limited to, the inspection of the parent and plug rails used in the welds, the preparation of the parent and plug rails, the performance of the tasks involved in conducting the thermite weld, post-weld preparation and handling of the weld, inspection of the weld, and/or the reporting of any defects or imperfections in the weld to NSRC.

113.    The Bartow Derailment was a direct and proximate result of RailWorks' negligence as set forth herein.

114.    As a direct and proximate result of RailWorks' negligence, NSRC has been damaged by incurring the costs, expenses, damages and fees identified herein and to be proven at trial.

115.    NSRC is entitled to recover all of its costs, expenses, damages and fees incurred in connection with the Woodville Derailment from RailWorks as a direct and proximate result of

RailWorks' negligence in performing the broken/failed weld that caused the Woodville Derailment.

## COUNT IV: NEGLIGENCE (WOODVILLE DERAILMENT)

116.    NSRC reincorporates and realleges the allegations asserted in the above paragraphs as if they were fully asserted herein.

117.    In undertaking to perform thermite welds for NSRC in or near Woodville, Alabama in December of 2018, RailWorks was obligated to exercise care for NSRC's safety, the safety of NSRC's employees and property and the safety of those individuals and entities whose persons or property were within reasonable proximity to the welds that RailWorks undertook to perform.

118.    In performing the welds that it performed for NSRC in or near Woodville, Georgia in December of 2018, RailWorks was obligated to exercise reasonable and ordinary care, and/or that degree of care that a reasonably prudent professional or similarly situated company would use under the same or similar circumstances in performing the thermite welds.

119.    In performing the broken/failed weld that caused the Woodville Derailment, RailWorks failed to exercise care for NSRC's safety, the safety of NSRC's employees and property, and the safety of those individuals and entities whose persons or property were within reasonable proximity to the welds that RailWorks undertook to perform.

120.    In performing the welds that it performed for NSRC in or near Woodville, Alabama in December of 2018, RailWorks failed to exercise reasonable and ordinary care, and/or that degree of care that a reasonably prudent professional or similarly situated company would use under the same or similar circumstances in performing the thermite welds.

121.    The broken/failed weld was caused by and/or the result of RailWorks' negligence in the performance of the tasks necessary to fully, safely, reasonably and prudently prepare a field

24

thermite weld.  These tasks include, but are not limited to, the inspection of the parent and plug rails used in the welds, the preparation of the parent and plug rails, the performance of the tasks involved in conducting the thermite weld, post-weld preparation and handling of the weld, inspection of the weld, and/or the reporting of any defects or imperfections in the weld to NSRC.

122.    The Woodville Derailment was a direct and proximate result of RailWorks' negligence as set forth herein.

123.    As a direct and proximate result of RailWorks' negligence, NSRC has been damaged by incurring the costs, expenses, damages and fees identified herein and to be proven at trial.

124.    NSRC is entitled to recover all of its costs, expenses, damages and fees incurred in connection with the Woodville Derailment from RailWorks as a direct and proximate result of RailWorks' negligence in performing the broken/failed weld that caused the Woodville Derailment.

**COUNT V: EXPRESS INDEMNITY (BARTOW DERAILMENT)**

125.    NSRC reincorporates and realleges the allegations asserted in the above paragraphs as if they were fully asserted herein.

126.    RailWorks contracted and agreed to indemnify NSRC and hold it harmless with respect to liability, claims, suits, judgments, costs and expenses arising from its work under the Welding Contract, including but not limited to its performance and provision of thermite welds to or for NSRC.  Specifically, RailWorks covenanted and agreed that:

(a) **Contractor shall indemnify and hold harmless [NSRC]** from and against any and all liability, damages, claims, suits, judgments, costs and expenses (including litigation costs, investigation costs, reasonable attorney fees, environmental clean-up costs . . .), fines, penalties, and losses arising out of:

. . . .

25

(i)(B) . . . . any actual or alleged loss of life of or personal injury to any person or the loss of or damage to any property arising out of the negligent acts or omissions or willful misconduct of [RailWorks], except to the extent that the property loss or damage or personal injury or death was caused by the negligence or intentional misconduct of [NSRC].

. . . .

(iii)    any alleged violation of any law, statute, code, ordinance or regulation of the United States or of any state, county or municipal government (including those relating to air, water, noise, solid waste and other forms of environmental protection, contamination or pollution . . .) to the extent it results from the activities of [RailWorks] contributing to such violation, regardless of whether such activities, acts or omissions are intentional or negligent, and regardless of any specification by [NSRC] without actual knowledge that it might violate any such law, statute, code, ordinance or regulation . . . .

Welding Contract § 5.1 (emphasis added).

127.    The Bartow Derailment arose out of RailWorks' negligent acts or omissions as set forth herein.

128.    On information and belief, the Bartow Derailment arose out of RailWorks' violation of applicable law, statute, code, ordinance and/or regulation.  RailWorks' violation of such law, statute, code, ordinance and/or regulation was a cause of, or contributing factor to, the Bartow Derailment.

129.    Under the clear terms of § 5.1 of the Welding Contract, NSRC is entitled to full indemnity from RailWorks for all costs, expenses, damages and fees incurred by NSRC as a result of or connection with the Bartow Derailment.

130.    NSRC has sought indemnity from RailWorks for its costs, expenses, damages and fees incurred by NSRC as a result of or in connection with the Bartow Derailment, however RailWorks has breached the Welding Contract by failing and refusing to indemnify NSRC as required by the Welding Contract.

131.     NSRC is entitled to recover all of its costs, expenses, damages and fees incurred in connection with the Bartow Derailment from RailWorks as a direct and proximate result of RailWorks' indemnity obligation to NSRC with respect to the broken/failed weld that caused the Bartow Derailment and RailWorks' breach of its indemnity obligation.

**COUNT VI: EXPRESS INDEMNITY (WOODVILLE DERAILMENT)**

132.     NSRC reincorporates and realleges the allegations asserted in the above paragraphs as if they were fully asserted herein.

133.     RailWorks contracted and agreed to indemnify NSRC and hold it harmless with respect to liability, claims, suits, judgments, costs and expenses arising from its work under the Welding Contract, including but not limited to its performance and provision of thermite welds to or for NSRC.  Specifically, RailWorks covenanted and agreed that:

(a) **Contractor shall indemnify and hold harmless [NSRC]** from and against any and all liability, damages, claims, suits, judgments, costs and expenses (including litigation costs, investigation costs, reasonable attorney fees, environmental clean-up costs . . .), fines, penalties, and losses arising out of:

. . . .

(i)(B) . . . . any actual or alleged loss of life of or personal injury to any person or the loss of or damage to any property arising out of the negligent acts or omissions or willful misconduct of [RailWorks], except to the extent that the property loss or damage or personal injury or death was caused by the negligence or intentional misconduct of [NSRC].

. . . .

(iii)     any alleged violation of any law, statute, code, ordinance or regulation of the United States or of any state, county or municipal government (including those relating to air, water, noise, solid waste and other forms of environmental protection, contamination or pollution . . .) to the extent it results from the activities of [RailWorks] contributing to such violation, regardless of whether such activities, acts or omissions are intentional or negligent, and regardless of any specification by [NSRC] without actual knowledge that it might violate any such law, statute, code, ordinance or regulation . . . .

27

Welding Contract § 5.1 (emphasis added).

134.    The Woodville Derailment arose out of RailWorks' negligent acts or omissions as set forth herein.

135.    On information and belief, the Woodville Derailment arose out of RailWorks' violation of applicable law, statute, code, ordinance and/or regulation.  RailWorks' violation of such law, statute, code, ordinance and/or regulation was a cause of, or contributing factor to, the Woodville Derailment.

136.    Under the clear terms of § 5.1 of the Welding Contract, NSRC is entitled to full indemnity from RailWorks for all costs, expenses, damages and fees incurred by NSRC as a result of or connection with the Woodville Derailment.

137.    NSRC has sought indemnity from RailWorks for its costs, expenses, damages and fees incurred by NSRC as a result of or in connection with the Woodville Derailment, however RailWorks has breached the Welding Contract by failing and refusing to indemnify NSRC as required by the Welding Contract.

138.    NSRC is entitled to recover all of its costs, expenses, damages and fees incurred in connection with the Woodville Derailment from RailWorks as a direct and proximate result of RailWorks' indemnity obligation to NSRC with respect to the broken/failed weld that caused the Woodville Derailment and RailWorks' breach of its indemnity obligation.

### COUNT VII:        CONTRIBUTION (BARTOW DERAILMENT)

139.    NSRC reincorporates and realleges the allegations asserted in the above paragraphs as if they were fully asserted herein.

I-1847464.1

140.    Hundreds of persons whose property or persons were injured or damaged, both directly and indirectly, by the Bartow Derailment asserted claims and demands against NSRC for such injury or damage.

141.    Without admitting liability, NSRC entered into reasonable settlement agreements with those persons asserting claims or demands for injury to their person or property in which NSRC paid those persons to forego litigating their claims against NSRC arising from the Bartow Derailment.

142.    RailWorks was responsible for the injuries and damage arising from the Bartow Derailment because RailWorks was negligent with respect to its preparation and performance of the broken/failed thermite weld that caused the Bartow Derailment, and because RailWorks failed to prepare and perform the broken/failed thermite weld that caused the Bartow Derailment in accordance with the terms if the Welding Contract and the warranties contained in the Welding Contract.

143.    NSRC is entitled to common law and/or statutory contribution from RailWorks under applicable law for all or a portion of the amount of the settlements.

**COUNT VIII:    CONTRIBUTION (WOODVILLE DERAILMENT)**

144.    NSRC reincorporates and realleges the allegations asserted in the above paragraphs as if they were fully asserted herein.

145.    Persons whose property or persons were injured or damaged, both directly and indirectly, by the Woodville Derailment asserted claims and demands against NSRC for such injury or damage.

146.    Without admitting liability, NSRC entered into reasonable settlement agreements with those persons asserting claims or demands for injury to their person or property in which

I-1847464.1

NSRC paid those persons to forego litigating their claims against NSRC arising from the Woodville Derailment.

147.    RailWorks was responsible for the injuries and damage arising from the Woodville Derailment because RailWorks was negligent with respect to its preparation and performance of the broken/failed thermite weld that caused the Woodville Derailment, and because RailWorks failed to prepare and perform the broken/failed thermite weld that caused the Woodville Derailment in accordance with the terms if the Welding Contract and the warranties contained in the Welding Contract.

148.    NSRC is entitled to common law and/or statutory contribution from RailWorks under applicable law for all or a portion of the amount of the settlements.

### COUNT IX: IMPLIED INDEMNITY (BARTOW DERAILMENT)

149.    NSRC reincorporates and realleges the allegations asserted in the above paragraphs as if they were fully asserted herein.

150.    NSRC was exposed to liability and reasonably compelled or required under the circumstances to pay damages arising from the Bartow Derailment as set forth herein.

151.    NSRC was not at fault for the Bartow Derailment.

152.    The Bartow Derailment was caused solely by RailWorks' negligent acts or omissions and breaches of the Welding Contract as set forth herein.

153.    RailWorks will be unjustly enriched if it does not fully indemnify NSRC for NSRC's full losses, expenses, costs and damages incurred in connection with the Bartow Derailment.

I-1847464.1

154.    Under applicable law, NSRC is entitled to implied indemnity from RailWorks with respect to all losses, expenses, costs and damages incurred in connection with the Bartow Derailment.

### COUNT X: IMPLIED INDEMNITY (WOODVILLE DERAILMENT)

155.    NSRC reincorporates and realleges the allegations asserted in the above paragraphs as if they were fully asserted herein.

156.    NSRC was exposed to liability and reasonably compelled or required under the circumstances to pay damages arising from the Woodville Derailment as set forth herein.

157.    NSRC was not at fault for the Woodville Derailment.

158.    The Woodville Derailment was caused solely by RailWorks' negligent acts or omissions and breaches of the Welding Contract as set forth herein.

159.    RailWorks will be unjustly enriched if it does not fully indemnify NSRC for NSRC's full losses, expenses, costs and damages incurred in connection with the Woodville Derailment.

160.    Under applicable law, NSRC is entitled to implied indemnity from RailWorks with respect to all losses, expenses, costs and damages incurred in connection with the Woodville Derailment.

### **PRAYER FOR RELIEF**

WHEREFORE, Norfolk Southern Railway Company respectfully requests that the Court ender an Order and Judgment granting NSRC any and/or all of the following relief:

i.    An award of money damages sufficient to compensate NSRC for all actual, incidental, and/or consequential damages, expenses, fees, costs and liabilities suffered and/or

incurred as a result of RailWorks' wrongful conduct and/or breaches of duty and obligation set forth herein;

   ii. An award of money damages such that will provide NSRC full and complete indemnification for all damages, expenses, fees, costs and liability suffered and/or incurred as a result of RailWorks' wrongful conduct and/or breaches of duty and obligation set forth herein;

   iii. An award of all attorneys' fees, costs and expenses incurred in connection with the Bartow Derailment and the Woodville Derailment, including but not limited to all attorneys' fees, costs and expenses incurred in connection with this action;

   iv. An award of prejudgment and post-judgment interest on all money damages awarded herein; and

   v. An award of such other and further relief as this Court may deem just, equitable and/or appropriate under the circumstances of this case.


**TO BE TRIED BY THE COURT WITHOUT A JURY**


       **NORFOLK SOUTHERN RAILWAY COMPANY**


      By_____/s/ David C. Bowen_____
           Of Counsel

      David C. Bowen, Esq., VSB No. 26771
      dbowen@wilsav.com
      Marina G. Batalias, Esq., VSB No. 96097
      Mbatalias@wilsav.com
      WILLCOX SAVAGE, P.C.
      440 Monticello Avenue, Suite 2200
      Norfolk, Virginia 23510
      Telephone No. (757) 628-5500
      Facsimile: (757) 628-5566

J.H. Mahaney (pro hac vice motion to be submitted)
Jacob N. Holden (pro hac vice motion to be submitted)
William C. Brown, III (pro hac vice motion to be submitted)
Dinsmore & Shohl LLP
611 Third Avenue
Huntington, WV 25701
P: (304) 691-8320
F: (304) 522-4312
john.mahaney@dinsmore.com
jacob.holden@dinsmore.com
william.brown@dinsmore.com

Mark E. Toth (pro hac vice motion to be submitted)
Hall, Bloch, Garland & Meyer, LLP
Post Office Box 5088
Macon, Georgia 31208-5088
P: (478) 745-1625
F: (478) 741-8822
marktoth@hbgm.com

**Counsel for Plaintiff,**
**Norfolk Southern Railway Company**

I-1847464.1