UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

NORFOLK SOUTHERN RAILWAY COMPANY,

        Plaintiff,

v.                                   Civil No. 2:22cv3

RAILWORKS MAINTENANCE OF WAY, INC.,

        Defendant.

## OPINION AND ORDER

This action is before the Court on a motion for partial summary judgment filed by Plaintiff Norfolk Southern Railway Company ("Norfolk Southern"), ECF No. 75, and a motion for summary judgment filed by Defendant RailWorks Maintenance of Way LLC (formerly known as RailWorks Maintenance of Way, Inc.) ("RailWorks"), ECF No. 77. After careful consideration of the briefs submitted by the parties, the Court determines that a hearing is unnecessary because the facts and legal contentions are adequately presented, and oral argument would not aid in the decisional process. Fed. R. Civ. P. 78(b); E.D. Va. Loc. R. 7(J). Therefore, the Court **DENIES** Norfolk Southern's request for a hearing. ECF No. 76, at 25. For the reasons stated below, the Court **DENIES** Norfolk Southern's motion for partial summary judgment, ECF No. 75, and **GRANTS in part and DENIES in part** RailWorks's motion for summary judgment, ECF No. 77.

## I. BACKGROUND[1]

This case concerns a train derailment that occurred in 2019 in Bartow, Georgia (the "Derailment").[2] Norfolk Southern is a rail transportation company, primarily operating in the eastern United States. ECF No. 1 ¶ 11. RailWorks is a "qualified track maintenance operator." ECF No. 16 ¶ 20. On or about April 1, 2017, Norfolk Southern and RailWorks entered into a contract entitled "Service Contract for Work on or About Railway's Right of Way" (the "Welding Agreement") pursuant to which RailWorks agreed to perform thermite welding on Norfolk Southern's tracks. ECF No. 76-9.

### A. Thermite Welding

The specifics of the thermite welding process are only somewhat relevant to these motions. Put simply, thermite welding is a method of joining the ends of two pieces of rail. The two ends of the rail (known as the "parent rail") are heated to prepare for the weld. Then, a mold is placed around the two ends of the parent rail and the gap between them. A crucible containing

---

[1] Unless otherwise noted, these background facts are drawn from the statements of fact in the parties' summary judgment briefing and are undisputed.

[2] This case originally involved two train derailments, the Bartow Derailment and another derailment in Woodville, Alabama. See ECF No. 1 (basing Counts I, III, V, VII, and IX on the Bartow derailment and Counts II, IV, VI, VIII, and X on the Woodville derailment). However, following a settlement with respect to the Woodville derailment, the parties entered a Rule 41 Stipulation of Dismissal with respect to the Woodville Counts. ECF No. 74. Consequently, the only derailment now relevant to this case is the Bartow incident.

thermite is then placed over the mold.  The thermite is ignited, causing an exothermic reaction that fills the mold with molten metal, which hardens in the gap, leaving a solid piece of rail. The portion of the parent rail that is pre-heated is known as the "heat-affected zone" or "HAZ."  The "fusion zone" is the area created by the molten metal from the thermite charge that fills the gap and the metal from either end of the parent rail that melts and fuses with the molten metal that fills the gap.  Sometimes, when a portion of existing track needs to be replaced, that portion of rail is removed, and a piece of replacement rail, called "plug rail," is installed in its place, using thermite welds at either end of the plug rail to attach it to the existing track.

## B. The Welding Agreement

As noted above, in 2017, Norfolk Southern and RailWorks entered into the Welding Agreement, pursuant to which RailWorks would provide thermite welding services on tracks owned by Norfolk Southern.  Starting in 2016, before the parties executed the Welding Agreement, RailWorks conducted two rounds of "test" or "qualification" welds at a Norfolk Southern facility in Roanoke, Virginia.  As a result of these test welds, a number of revisions were made to MW&S Standard Procedure 425 ("MW&S 425"), the thermite welding specifications that RailWorks was ultimately required to follow when performing thermite welds for Norfolk Southern under the Welding Agreement.

3

Section 1.1 of the Welding Agreement, entitled "Work," states in relevant part:

> [RailWorks] shall furnish, at [RailWorks]'s expense, all superintendence, labor, Training (as defined herein), equipment, tools, supplies, permits, signs, transportation and materials necessary to perform, and [RailWorks] shall perform and complete, the following work, which is more fully described in the Contract Documents listed in Section 1.2 below (the "Work"):
>
> **Systemwide Thermite and Electric Welding Services as outlined in Attachment A**

ECF No. 76-9, at 1.   Section 1.2, entitled "Contract Documents," states:

> The following papers, plans and specifications are incorporated by reference in and made a part of this Contract, whether or not they are physically attached hereto (collectively, the "Contract Documents"):
>
> **1. CONTRACTOR'S PROPOSAL DATED January 27, 2017 but excluding any standard sales order or other similar documents of Contractor that may be attached to such proposal (the "Proposal") and provided that any terms of the Proposal that conflict with the terms otherwise set forth in this Contract shall be disregarded and have no legal effect.**
> **2. ATTACHMENT A – GENERAL CONDITIONS**
> **3. ATTACHMENT B – SCHEDULE OF PRICING AND CONDITIONS**
> **4. NORFOLK SOUTHERN OPERATING GUIDELINES FOR CONTRACTORS**

Id.   Attachment A sets forth the "general conditions" governing the "Work" that RailWorks would undertake pursuant to the Welding Agreement, including laying out Norfolk Southern's and RailWorks's respective responsibilities regarding that Work.   As relevant here, Attachment A states:

1.  [RailWorks]  will  perform  thermite  welding  for [Norfolk Southern] as designated and in accordance with specifications  approved  by  [Norfolk  Southern].    This work shall, at all times, be subject to the inspection and approval of [a Norfolk Southern] officer.

2.    The    thermite    welding    will    be    performed    by [RailWorks]  personnel  at  such  times  and  locations designated by [Norfolk Southern]'s officer . . . .

4.  [RailWorks]  shall  perform  the  work  with  crews consisting of a foreman-welder and a welder-helper.  The [RailWorks]  crew  will  have  a  suitable  truck  equipped with  rail  guide  wheels,  hydraulic  power  (specific charge),  [Norfolk  Southern]  approved  radio,  tool  and welding kit storage and grinding equipment. . . .

6. [Norfolk Southern] will supply the welding kits, specified    tools    and    consumables.        The    attachment specifies  [RailWorks]  and  [Norfolk  Southern]  supplied items.

7.  [RailWorks]  will  provide,  at  the  request  of [Norfolk  Southern]  representatives,  certain  of  the [Norfolk  Southern]  supplied  materials  reimbursed  at actual  cost  as  supported  by  invoice  or  credit  card receipt. . . .

Id. at 19-20.

Section 2.3 of the Welding Agreement sets forth a number of warranties made by RailWorks, two of which are relevant here. First, RailWorks "warrants that it shall perform and complete the Work in a safe, efficient and workmanlike manner strictly in accordance with the requirements of this Contract and that all Persons performing Work on behalf of [RailWorks] shall have all training, licenses and/or certifications . . . as may be necessary or desirable to perform the Work . . . ." Id. at 2.  Second, RailWorks "warrants that the Work shall be free of defects and

5

imperfections, and fully suitable for the use and purposes for which each and every piece or part is intended, for a period not less than one year after the date on which the Engineer certifies that the Work has been completed."  Id.

## C. The Derailment

The welding work and subsequent Derailment that form the basis for this case occurred near mile marker 112.98, in Bartow, Georgia. On October 15, 2018, a RailWorks welder and welder helper performed two thermite welds, one at either end of a piece of plug rail that previously had been installed in 2017 using "joint bars," rather than thermite welding, to hold the plug rail in place.  After the RailWorks crew finished the thermite welding, the work was visually inspected, first by the crew itself and then by Norfolk Southern's welding supervisor.  Neither the RailWorks crew nor the Norfolk Southern supervisor identified any visual defects or other concerns with the welding.  Periodically thereafter, Norfolk Southern inspected its tracks in the area of the welding work as required by the Federal Railroad Administration under 49 C.F.R. Part 213, though RailWorks disputes "that the track inspectors were properly inspecting the areas on or adjacent to the track for conditions that may result in rail breaks."  ECF No. 79, at 6.  In the weeks leading up to the Derailment, Norfolk Southern did not identify any "defects of any kind in the ballast, roadbed, track

structure (including the ties) or the rail at the location of the welds." ECF No. 76, at 10.

On January 6, 2019, less than three months after the relevant welding work, the welded rail near mile marker 112.98 failed at both ends of the plug rail as Norfolk Southern train 373 passed over it, without derailing, at approximately 4:41 p.m. Later that same day, Norfolk Southern train 192 approached the welds from the opposite direction. Video footage from both trains confirmed that the welds were intact prior to train 373 crossing over them and were fractured prior to train 192 crossing over them. The parties therefore agree that the fractures occurred when train 373 passed over the welds. As train 192 crossed over the fractured rail, one of its locomotives and 39 of its 103 cars derailed. At the time of the Derailment, 50 of the 103 cars were loaded and approximately half of those loaded cars were carrying hazardous materials.

Norfolk Southern alleges that four of the cars carrying hazardous materials "were damaged to the point that the hazardous materials they were transporting spilled or leaked." ECF No. 1 ¶ 44. Norfolk Southern further alleges that "residents living near the derailment area were evacuated and others were required to shelter-in-place" and that "[s]everal residents in and around the derailment area, as well as Norfolk Southern employees, claimed to have suffered and sustained personal injuries as a result of

their claimed exposure to hazardous materials leaked or released in connection with the derailment." Id. ¶ 45.

According to Norfolk Southern, it has "incurred substantial cost and expense in containing the release of hazardous materials caused by the derailment, removing and repairing the damaged freight cars and in repairing its railroad track and roadbed." Id. ¶ 46. Norfolk Southern also claims damages "as a result of the loss of use of the track involved in the derailment and as a result of other claims for personal injury asserted against it as a result of the derailment." Id.

### D. Procedural Background

Norfolk Southern filed its complaint in this Court on January 4, 2022. Id. In the five Counts involving the Bartow Derailment, Norfolk Southern alleges: Breach of Express Warranty (Count I); Negligence (Count III); Express Indemnity (Count V); Contribution (Count VII); and Implied Indemnity (Count IX). Id. Norfolk Southern seeks: (1) "money damages sufficient to compensate [Norfolk Southern] for all actual, incidental, and/or consequential damages, expenses, fees, costs and liabilities suffered and/or incurred as a result of RailWorks'[s] wrongful conduct and/or breaches of duty and obligation"; (2) "full and complete indemnification for all damages, expenses, fees, costs and liability suffered and/or incurred as a result of RailWorks'[s] wrongful conduct and/or breaches of duty and obligation"; (3) "all

attorneys' fees, costs and expenses incurred in connection with the Bartow Derailment"; and (4) "prejudgment and post-judgment interest on all money damages awarded." Id. at 31-32.

On April 13, 2023, the parties filed their cross-motions for summary judgment. Norfolk Southern moved for partial summary judgment as to Count I (Breach of Express Indemnity) and as to RailWorks's defense that the Derailment was caused by Norfolk Southern's misuse of its tracks. ECF Nos. 75, 76. RailWorks moved for total summary judgment as to all of Norfolk Southern's Counts, as well as summary judgment as to portions of Norfolk Southern's damages claim. ECF Nos. 77, 78. Each party filed an opposition brief to the other's motion on April 27, 2023. ECF Nos. 79, 80. Finally, each party filed a reply brief in support of its own motion on May 3, 2023. ECF Nos. 81, 82. Accordingly, both motions are ripe for consideration.

## II. LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that a district court shall grant summary judgment in favor of a movant if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."

_Anderson v. Liberty Lobby Inc._, 477 U.S. 242, 247-48 (1986)
(emphases in original).  "A genuine question of material fact
exists where, after reviewing the record as a whole, a court finds
that a reasonable [factfinder] could return a verdict for the
nonmoving party."  _Dulaney v. Packaging Corp. of Am._, 673 F.3d
323, 330 (4th Cir. 2012).

Although the initial burden on summary judgment falls on the
moving party, once a movant properly presents evidence supporting
summary judgment, the nonmoving party may not rest upon the mere
allegations in the pleadings, but instead must set forth specific
facts in the form of exhibits and sworn statements illustrating a
genuine issue for trial.  _Celotex Corp. v. Catrett_, 477 U.S. 317,
322-24 (1986).  The Court must only evaluate the evidence to the
extent necessary to determine whether there is "sufficient
disagreement to require submission to a [factfinder] or whether
[the evidence] is so one-sided that one party must prevail as a
matter of law."  _McAirlaids, Inc. v. Kimberly-Clark Corp._, 756
F.3d 307, 310 (4th Cir. 2014) (quoting _Liberty Lobby_, 477 U.S. at
251-52, 255).  In making its determination, "the district court
must view the evidence in the light most favorable to the nonmoving
party."  _Jacobs v. N.C. Admin. Off. of the Cts._, 780 F.3d 562, 568
(4th Cir. 2015) (cleaned up) (quoting _Tolan v. Cotton_, 572 U.S.
650, 657 (2014)).

When faced with cross-motions for summary judgment, the Court must "consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Defenders of Wildlife v. N.C. Dep't of Transp., 762 F.3d 374, 392 (4th Cir. 2014) (quoting Bacon v. City of Richmond, Va., 475 F.3d 633, 638 (4th Cir. 2007)). In doing so, the Court must "resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." Id. (quoting Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003)).

### III. DISCUSSION

The parties' summary judgment briefs raise a variety of interrelated issues but at times talk past each other due to the nature of the simultaneous briefing schedules. To analyze the issues as efficiently as possible, the Court first addresses choice of law and Norfolk Southern's argument regarding RailWorks's "misuse" defense, before analyzing whether summary judgment is appropriate on each of Norfolk Southern's five claims and, finally, turning to RailWorks's argument regarding damages.

#### A. Choice of Law

A federal court exercising diversity jurisdiction applies the substantive law of the forum state. Hanna v. Plumer, 380 U.S. 460, 465 (1965). Because Virginia is the forum state for this suit, the Court applies Virginia choice-of-law principles. See

_Demetres v. E. W. Const., Inc._, 776 F.3d 271, 273 (4th Cir. 2015).

Virginia law provides that where, as here, a contract includes a

valid choice-of-law provision, "the parties' choice of substantive

law should be applied" to contract issues.   _Settlement Funding,_

_LLC v. Von Neumann-Lillie_, 274 Va. 76, 80, 645 S.E.2d 436, 438

(2007) (citation omitted).   The Welding Agreement's choice-of-law

provision states:

> The laws of the Commonwealth of Virginia shall govern
> the construction and interpretation of this Contract and
> all rights and obligations of the parties under it,
> except that the legal effect of any indemnity obligation
> under this Contract for claims arising from personal
> injury or property damage shall be governed by the law
> of the state in which that personal injury or property
> damage occurred.

ECF No. 76-9, at 15.   Therefore, Virginia law applies to Norfolk

Southern's contract claims, except to the extent they concern "the

legal effect of any indemnity obligation under [the Welding

Agreement] for claims arising from personal injury or property

damage."   _Id._   Any such issues would instead be analyzed under

Georgia law because any personal injury or property damage claims

stemming from the Bartow derailment necessarily occurred in

Georgia.

The Welding Agreement's choice-of-law provision does not

dictate the applicable law for tort claims that arise directly

between Norfolk Southern and RailWorks.   As to tort claims,

"Virginia subscribes to the _lex loci delicti_ principle for

determining the applicable substantive law in tort suits."
Demetres, 776 F.3d at 273 (citing Jones v. R.S. Jones & Assocs.,
Inc., 246 Va. 3, 5, 431 S.E.2d 33, 34 (1993)). "According to that
principle, the law of the place in which the injury occurred
governs the substantive cause of action." Id. (citing Jones, 246
Va. at 5, 431 S.E.2d at 34). Based on this principle, RailWorks
asserts that Georgia law applies to any of Norfolk Southern's
claims that sounds in tort. ECF No. 78, at 18 n.7. Norfolk
Southern does not appear to dispute this assertion, and the Court
agrees with RailWorks. Again, the "injury" that serves as the
basis for this suit is the Bartow Derailment, which of course
occurred in Bartow, Georgia. Therefore, under Virginia's lex loci
delicti principle, Georgia law applies to all of Norfolk Southern's
tort claims.

## B. RailWorks's Misuse Defense

Norfolk Southern seeks summary judgment on RailWorks's
anticipated defense that the welded rails fractured due to Norfolk
Southern's misuse of the rails, rather than due to some flaw in
RailWorks's welding work. Norfolk Southern argues that RailWorks
cannot satisfy its burden of proof on its affirmative misuse
defense because it did not timely disclose any experts whose
testimony could prove that Norfolk Southern misused the rails.
Under the Rule 16(b) scheduling order entered in this case, a
"party having the burden of proof upon the primary issue to which

potential Rule 702, 703 or 705 evidence is directed" was required to identify any expert witnesses on that issue by January 6, 2023, and to file Rule 26(a)(2)(B) disclosures[3] by February 20, 2023. ECF No. 27, at 1; ECF No. 57. RailWorks, however, identified its experts on the misuse issue on March 20, 2023, when disclosures regarding rebuttal experts were due under the Rule 16(b) scheduling order. ECF No. 76, at 24. Citing Rule 37(c)(1) of the Federal Rules of Civil Procedure,[4] Norfolk Southern argues that those experts should not be "permitted to testify as to any issues on which RailWorks bears the burden of proof." Id. at 23-24. Norfolk Southern further asserts that, without that testimony, RailWorks has insufficient evidence to "prove that [Norfolk Southern] misused the thermite welding work or that [Norfolk Southern]'s misuse was the proximate cause of the derailment." Id. at 24. Consequently, Norfolk Southern seeks "summary judgment as to RailWorks'[s] misuse defense as a matter of law." Id. at 24-25.

RailWorks offers several counterarguments, each of which it asserts forecloses summary judgment on this issue. From a

---

[3] Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure governs the disclosure of reports by witnesses who are retained to provide expert testimony. Fed. R. Civ. P. 26(a)(2)(B).

[4] Rule 37(c)(1) provides, in relevant part:
> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Fed. R. Civ. P. 37(c)(1).

14

procedural standpoint, RailWorks argues that it is "premature" for Norfolk Southern to seek summary judgment on this issue because it has not moved to exclude RailWorks's expert evidence under Rule 37, which provides a mechanism to limit testimony when a party "fails to comply with orders regarding discovery." ECF No. 79, at 23.  It is true that Norfolk Southern's instant motion is a motion for summary judgment pursuant to Rule 56, not a motion _in limine_ pursuant to Rule 37, and the Court considers the motion on that basis.  Still, as another judge of this Court recently noted, the "intention of Rule 37(c)(1)'s preclusionary measure is to prevent the practice of 'sandbagging' an opposing party with new evidence, and it applies on motions for summary judgement." _Daedalus Blue, LLC v. Microstrategy Inc._, No. 2:20cv551, 2023 WL 5337826, at *8 (E.D. Va. Aug. 18, 2023) (cleaned up) (emphasis added) (quoting _Pace v. Air & Liquid Sys. Corp._, 171 F. Supp. 3d 254, 265 (S.D.N.Y. 2016)).  In other words, while the Court has not been presented with a Rule 37 motion, it nonetheless has the discretion to apply the Rule 37 standard and conclude that certain evidence should not be considered in determining whether summary judgment is appropriate.

Turning to the more substantive arguments, RailWorks asserts that the misuse defense is not actually an affirmative defense but rather merely rebuts the evidence supporting Norfolk Southern's argument that RailWorks is responsible for the fractures and

15

derailment.   The Court first observes that RailWorks expressly
identified misuse as an affirmative defense in its Answer.   In the
section entitled "Affirmative Defenses," RailWorks states that it
"will rely upon all <u>affirmative defenses</u> available, including but
not limited to, Plaintiff's contributory negligence, failure to
mitigate damages, <u>misuse, including poor track conditions</u>,
estoppel and waiver."   ECF No. 16 ¶ 168.   In its opposition brief,
RailWorks does not acknowledge or explain its apparent change of
opinion about the nature of this defense.

It is not necessarily obvious one way or the other whether
misuse should be considered an affirmative defense under the
circumstances of this case.   In a recent opinion, the Virginia
Supreme Court defined "affirmative defense" using the definition
found in <u>Black's Law Dictionary</u>: a "defendant's assertion of facts
and arguments that, if true, will defeat the plaintiff's . . .
claim, even if all the allegations in the complaint are true."
<u>Brown v. Virginia State Bar ex rel. Sixth Dist. Comm.</u>, --- Va. ---,
886 S.E.2d 492, 501 (2023) (alteration in original) (quoting
<u>Affirmative Defense</u>, <u>Black's Law Dictionary</u> (11th ed. 2019)).
<u>Black's Law Dictionary</u> defines a "negative defense" (i.e., a non-
affirmative defense) as a "defendant's outright denial of the
plaintiff's allegations without additional facts pleaded by way of
avoidance."   <u>Negative Defense</u>, <u>Black's Law Dictionary</u> (11th ed.
2019)).

16

Comparing these two definitions illustrates why there may be a lack of clarity on this question. On one hand, demonstrating Norfolk Southern in fact did misuse its tracks and that such misuse caused the Derailment will require RailWorks to introduce additional evidence beyond the evidence that Norfolk Southern will present to prove its case. Those facts, if proven to be true, could be fatal to Norfolk Southern's case. On the other hand, the misuse defense goes directly to one of the elements on which Norfolk Southern bears the burden of proof, and if RailWorks demonstrates that Norfolk Southern misused the tracks, it may prevent Norfolk Southern from meeting its burden regarding causation. In other words, RailWorks's proof of its misuse defense could be mutually exclusive with Norfolk Southern carrying its burden on causation. Consequently, RailWorks's misuse defense does not fit neatly within the Black's Law Dictionary definition of an affirmative defense, which suggests that proof of an affirmative defense is typically not inconsistent with proof of all of the elements of the cause of action.

Regardless, the Court need not wade further into this issue, which is best left for Virginia courts to consider, because even if the Court were to conclude that RailWorks's misuse defense is an affirmative defense — meaning that RailWorks did not timely identify its experts on this issue — the Court finds that this failure was harmless. See Hinkle v. City of Clarksburg, W.Va., 81

F.3d 416, 426 (4th Cir. 1996) ("District courts enjoy nearly unfettered discretion to control the timing and scope of discovery and impose sanctions for failures to comply with its discovery orders."). First, as noted above, it is not immediately obvious that RailWorks's misuse defense qualifies as an affirmative defense because the defense speaks to one of the elements that Norfolk Southern must prove to prevail. Although the Rule 16(b) scheduling order requires that the "party having the burden of proof upon the primary issue" disclose their expert opinions by February 20, 2023, responses from the opposing party's experts were not due until March 20, 2023. ECF Nos. 27, at 1; ECF No. 57. Because RailWorks does not bear the burden on the element of causation, it was at least justifiable for RailWorks to think, whether mistakenly or not, that its misuse experts did not need to be disclosed until March 20, 2023, when "disclosures intended solely to respond to, contradict or rebut [Norfolk Southern's expert] evidence" were to be made. ECF No. 27, at 1.

Second, and more importantly, the Court can discern no prejudice that Norfolk Southern could have suffered from RailWorks's "delay." As RailWorks highlights, Norfolk Southern had the opportunity to depose RailWorks's experts (which it did) and to identify one or more experts to rebut RailWorks's misuse experts pursuant to the scheduling order (which it did not). There is no suggestion that this alleged delay — which amounts to 70

days in the identification of the experts and only 28 days in the disclosure of their opinions — has hindered Norfolk Southern in any way in this litigation.  Thus, the Court finds it appropriate to consider RailWorks's experts' opinions and, consequently, denies Norfolk Southern's summary judgment motion to the extent it is predicated on RailWorks's inability to pursue its misuse defense due to the absence of admissible evidence from a defense expert.

## C. Count I — Breach of Express Warranty

In Count I, Norfolk Southern alleges that the welded rail fractures demonstrate that RailWorks breached two of the express warranties contained in Section 2.3 of the Welding agreement.  ECF No. 1 ¶¶ 75-90.  Under the challenged warranties, RailWorks promised: (1) that its Work would be "free of defects and imperfections, and fully suitable for the use and purposes for which each and every piece or part is intended, for a period not less than one year"; and (2) that it would "perform and complete the Work in a safe, efficient and workmanlike manner strictly in accordance with the requirements of" the Welding Agreement.  ECF No. 76-9, at 2.  Because both Norfolk Southern and RailWorks cross-move for summary judgment on Count I, the Court — having first analyzed each motion separately — discusses the parties' arguments and counterarguments concurrently here for efficiency.

Under Virginia law, the "elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to

a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." Navar, Inc. v. Fed. Bus. Council, 291 Va. 338, 344, 784 S.E.2d 296, 299 (2016) (quoting Ulloa v. QSP, Inc., 271 Va. 72, 79, 624 S.E.2d 43, 48 (2006)). To prove damages, a plaintiff must demonstrate (1) "a causal connection between the defendant's wrongful conduct and the damages asserted" and (2) "the amount of those damages by using a proper method and factual foundation for calculating damages." Id. at 344-45 (quoting Saks Fifth Ave., Inc. v. James, Ltd., 272 Va. 177, 189, 630 S.E.2d 304, 311 (2006)). Here, the parties do not dispute that the Welding Agreement creates, as a general matter, a legally enforceable obligation of RailWorks to Norfolk Southern, although they disagree regarding the scope of the term "Work" in the Welding Agreement. Beyond that, the parties' dispute primarily centers on the remaining two elements, breach and causation.[5]

---

[5] In a footnote to its opening brief, RailWorks notes that, although it intends to argue at trial that it did not breach any contractual duty to Norfolk Southern, it "does not focus on the element of breach for purpose of this motion because that [] is ultimately an issue of fact." ECF No. 78, at 13 n.6. RailWorks instead argues that, even assuming Norfolk Southern can prove RailWorks breached § 2.3 of the Welding Agreement, Norfolk Southern cannot demonstrate causation. The Court observes, however, that breach and causation are substantially intertwined in this case, where the parties have only offered two possible versions of events: (1) that RailWorks performed bad welds; or (2) that Norfolk Southern misused its tracks. Although the inquiries are distinct, it seems that causation and breach largely, if not entirely, rise and fall together in this case. If RailWorks's improper welding caused the fractures and derailment, RailWorks necessarily breached § 2.3; if, on the other hand, the rails fractured due to Norfolk Southern's misuse, Norfolk Southern likely could not prove that RailWorks breached § 2.3.

### 1. The "Work"

Under the Welding Agreement, RailWorks warranted that it would "perform and complete the Work in a safe, efficient and workmanlike manner" and that "the Work shall be free of defects and imperfections, and fully suitable for the use and purposes for which each and every piece or part is intended, for a period not less than one year." ECF No. 76-9, at 2. Norfolk Southern argues that, because (1) RailWorks "warranted that the completed product of its thermite welding work would function to allow the safe passage of trains over the area where the work was performed for at least one year" and (2) the welds broke less than one year after the work was performed, RailWorks necessarily breached the Welding Agreement as a matter of law. ECF No. 76, at 1-2. RailWorks counters that the warranties only applied to its "Work," as defined by the Welding Agreement, and that the area of the welds where the fractures "initiated" (the heat-affected zone, or "HAZ") does not fall within that "Work." RailWorks argues that because it "undertook to perform thermite welds" for Norfolk Southern pursuant to the Welding Agreement, the term "Work" is "limited to the thermite welds themselves," which consist "solely of the fusion zone where the two rail ends are welded or fused together." ECF No. 79, at 11.

The Welding Agreement defines the "Work" as "Systemwide Thermite and Electric Welding Services as outlined in Attachment

A" and provides that the "Work" is "more fully described in the Contract Documents listed in Section 1.2" of the Welding Agreement. ECF No. 76-9, at 1. Section 1.2 provides a list of "papers, plans and specifications [that] are incorporated by reference in and made a part of" the Welding Agreement:

1. CONTRACTOR'S PROPOSAL DATED January 27, 2017 . . .
2. ATTACHMENT A – GENERAL CONDITIONS
3. ATTACHMENT B – SCHEDULE OF PRICING AND CONDITIONS
4. NORFOLK SOUTHERN OPERATING GUIDELINES FOR CONTRACTORS

Id. Taking these provisions together, the Work is most succinctly described as the welding services that RailWorks contracted to provide to Norfolk Southern. Both RailWorks and Norfolk Southern agree that the thermite welding process requires heating up the two ends of parent rail that are being joined and that doing so necessarily creates the HAZ. See ECF No. 76, at 16-17 (Norfolk Southern) ("[T]he performance and completion of thermite welds necessarily includes the creation of the heat-affected zone[.]"); ECF No. 78, at 7 (RailWorks) ("Every thermite weld creates a 'heat affected zone' or 'HAZ.' The HAZ, or heat affected zone, is the region of base material immediately adjacent to a weld which is exposed to high temperatures." (citations omitted)). In other words, the creation of a HAZ is intrinsic to the thermite welding services that RailWorks contracted to provide to Norfolk Southern under the Welding Agreement. ECF No. 78, at 7 (acknowledging that the "creation of a HAZ is a natural consequence of the Work").

22

Consequently, the most natural interpretation of the "Systemwide Thermite and Electric Welding Services" composing the "Work" would include the HAZ.[6]

Although RailWorks argues that the HAZ is excluded from the "Work," RailWorks points to nothing in the Welding Agreement or in case law suggesting that the defined term "Work" is more limited in scope than the actual thermite welding services that RailWorks contracted to provide.   RailWorks's argument seems to be that because the essential purpose of the Welding Agreement was for RailWorks to produce welds, its "Work" as defined by the Agreement is limited to those welds and nothing more.   But the creation of the HAZ is a necessary part of producing those welds; the HAZ would not exist without the welding, and no welds could be achieved without also creating the HAZ.   It is not reasonable to conclude that RailWorks's warranties about its "Work" were artificially limited to only a subpart of the final product, particularly given that the Welding Agreement does not define the "Work" as "welds" but rather as "Welding Services."   ECF No. 76-9, at 1.

---

[6] To provide additional context, the parties also disagree factually about whether the fracture "initiated" right at the boundary between the fusion zone and the HAZ (Norfolk Southern's position) or 0.004 inches into the HAZ (RailWorks's position).   See ECF No. 80, at 4.   This disagreement has no legal significance here because the Court concludes that the HAZ is part of the "Work," but it highlights the incredibly close connection between the fusion zone and the HAZ, as well as the potential challenge in identifying a clear boundary between them.

## 2. The Source of the Fractures

Unsurprisingly, the crux of the dispute between the parties centers on what caused the welded rails to fracture, in turn causing the Derailment. Norfolk Southern argues that it is entitled to summary judgment on Count I because RailWorks violated the express warranty that its Work would be "free of defects and imperfections" and "fully suitable" for its intended use for at least one year, id. at 2, as the welded rails fractured less than three months after RailWorks completed the thermite welds. ECF No. 76, at 18. In contrast, RailWorks argues that it is entitled to summary judgment on Count I because Norfolk Southern does not have sufficient evidence to prove that RailWorks's welding work caused the rails to fracture. ECF No. 78, at 13.

In support of their respective positions, both parties rely heavily on their respective experts' opinions to support the conclusion that they are entitled to summary judgment as a matter of law. The Court has "consider[ed] each motion separately on its own merits" and, in both instances, has sought to "resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion" to "determine whether either of the parties deserves judgment as a matter of law." Defenders of Wildlife, 762 F.3d at 392 (citations omitted). However, the competing analyses of causation presented by the parties' respective experts are mutually exclusive such

that there remain genuine issues of material fact regarding the cause of the fractures that led to the Derailment. "The evidence therefore sets up a battle of the experts, which should not be resolved at summary judgment." Reyazuddin v. Montgomery Cnty., 789 F.3d 407, 417 (4th Cir. 2015).

### 3. The Spearin Doctrine

RailWorks separately argues that it is entitled to summary judgment on Count I under the Spearin doctrine, named for the United States Supreme Court's decision in United States v. Spearin, 248 U.S. 132 (1918). In that case, the Supreme Court concluded that, "if [a] contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications," even where the contractor agreed to "examine the site, to check up the plans, and to assume responsibility for the work until completion and acceptance." Id. at 136-37. The Virginia Supreme Court adopted the Spearin doctrine in Southgate v. Sanford & Brooks, Co., 147 Va. 554, 562-64, 137 S.E. 485, 487-88 (1927), and later modified its application in Greater Richmond Civic Recreation, Inc. v. A. H. Ewing's Sons, Inc., 200 Va. 593, 106 S.E.2d 595 (1959). As announced in Greater Richmond Civil Recreation, the rule in Virginia is that:

> a construction contractor who has followed plans and
> specifications furnished by the owner which have proved
> defective or insufficient will not be responsible to the

> owner for loss or damage which results solely from the
> defective or insufficient plans and specifications in
> the absence of negligence on the contractor's part, or
> any express guarantee or warranty by him as to their
> being sufficient or free from defects.

Id. at 595, 106 S.E.2d at 597.

RailWorks argues that the Spearin doctrine applies here
because Norfolk Southern "dictated every facet of the welding that
comprised RailWorks'[s] Work," and "RailWorks fully complied with
th[ose] requirements." ECF No. 78, at 17. RailWorks emphasizes
that "[n]othing in [the] Welding Agreement constitutes an express
warranty that [Norfolk Southern's] MW&S 425 Procedures were free
from error or would yield defect free Work." Id.

Norfolk Southern argues in opposition that the Spearin
doctrine requires RailWorks to prove that the given plans and
specifications were deficient and that RailWorks cannot do so here
because "undisputed testimony," including "testimony from
RailWorks experts," demonstrates that "if RailWorks'[s] welders
followed the procedures outlined in MW&S 425, they would [have]
produce[d] a quality thermite weld that would not [have] fail[ed]
prematurely, but would [have] perform[ed] as intended." ECF No.
80, at 10-11. Norfolk Southern separately argues that "the Spearin
Doctrine's implied warranty may be waived by a contractor's express
warranty allocating the risk of a defective product to the
subcontractor" and that Section 2.3 of the Welding Agreement
amounts to such a waiver. Id. at 12-13.

Here, the Court does not squarely take up Norfolk Southern's primary counterarguments, which (as RailWorks argues) are grounded in case law from courts outside Virginia. Rather, the Court easily concludes that summary judgment on the Spearin doctrine issue is precluded by the parties' apparent genuine factual dispute about whether or not RailWorks did follow the procedures prescribed by the Welding Agreement and MW&S 425. See, e.g., ECF No. 78, at 8 (RailWorks) ("RailWorks performed its Work under the Welding Agreement for the Bartow welds in accordance with [Norfolk Southern]'s MW&S 425 Procedures."); ECF No. 80, at 3 (Norfolk Southern) ("[T]he amount of finning on a weld is [a] reflection of the quality of the welder's work in properly applying and sealing the mold before performing the thermite weld. Here, the amount of finning . . . [was] far beyond what would be expected or allowable under [Norfolk Southern]'s MW&S 425."). For the same reasons discussed in Part III.C.2 supra, disputed issues of material fact remain regarding whether RailWorks properly executed the Bartow welds, and, therefore, the Court cannot conclude at this juncture that the Spearin doctrine bars recovery on Count I.

*     *     *

In sum, the Court holds that the "HAZ" falls within the Welding Agreement's definition of the "Work" but further concludes that genuine disputes of material fact remain as to Count I, precluding summary judgment for either party.

## D. Count III - Negligence

In Count III, Norfolk Southern alleges that RailWorks performed the Bartow welds negligently in violation of its duty to "exercise care for [Norfolk Southern]'s safety, the safety of [Norfolk Southern]'s employees and property, and the safety of those individuals and entities whose persons or property were within reasonable proximity to the welds that RailWorks undertook to perform." ECF No. 1 ¶¶ 107-15. Because Count III is a tort claim, Georgia substantive law applies. "To maintain a viable negligence action, a plaintiff must satisfy the elements of the tort: the existence of a duty on the part of the defendant, a breach of such duty, causation of the injury alleged, and damages as a result of the alleged breach of duty." Wells Fargo Bank, N.A. v. Jenkins, 293 Ga. 162, 163, 744 S.E.2d 686, 687 (2013) (citation omitted).

Under Georgia law, a negligent construction claim does not derive from contractual duties but rather requires proof of a "breach of a duty implied by law to perform the work in accordance with industry standards." Schofield Interior Contractors, Inc. v. Standard Bldg. Co., 293 Ga. App. 812, 814, 668 S.E.2d 316, 318 (2008) (quoting Fussell v. Carl E. Jones Dev. Co., 207 Ga. App. 521, 522, 428 S.E.2d 426, 427 (1993)). "The law imposes upon building contractors and others performing skilled services the obligation to exercise a reasonable degree of care, skill, and

ability, which is generally taken and considered to be such a degree of care and skill as . . . is ordinarily employed by others of the same profession." Id. (quoting Howell v. Ayers, 129 Ga. App. 899, 900, 202 S.E.2d 189, 190-91 (1973)). Thus, to prove a claim for negligent construction under Georgia law, a plaintiff must present evidence sufficient to establish the relevant professional standard of care. Bilt Rite of Augusta, Inc. v. Gardner, 221 Ga. App. 817, 817, 472 S.E.2d 709, 710 (1996).

Generally, plaintiffs in a negligent construction case must satisfy this burden "by the introduction of expert testimony." Id. (citing Newberry v. D.R. Horton, Inc., 215 Ga. App. 858, 858, 452 S.E.2d 560, 561 (1994)). This method is preferred because a factfinder "cannot rationally apply negligence principles to professional conduct" without evidence demonstrating what a "competent professional would have done under similar circumstances," and because it is improper to permit the factfinder to "speculate about what the professional custom may be, there must be expert evidence as to the professional custom required in such cases." Id. (citing Hughes v. Malone, 146 Ga. App. 341, 345-346, 247 S.E.2d 107, 111 (1978)). However, as the Bilt Rite court made clear, expert testimony is not always necessary because "even in professional negligence cases, evidence of negligence in some cases may be so 'clear and palpable' that it may be understood by [the factfinder] without expert evidence as to a professional

29

standard of care." Id. (quoting Hughes, 146 Ga. App. at 345, 247
S.E.2d at 111); see also Khoury Constr. Co. v. Earhart, 191 Ga.
App. 562, 563, 382 S.E.2d 392, 394 (1989).

Consequently, the issues before this Court on summary
judgment regarding Count III are two-fold: (1) whether Norfolk
Southern has identified an expert on the issue of the relevant
professional standard of care; and (2) if not, whether the evidence
of negligence in this case could be considered so "clear and
palpable" that such expert testimony is not necessary to establish
the standard of care.   Turning to the first issue, RailWorks
contends that Norfolk Southern has not identified an expert who
can testify regarding the relevant standard of care.   ECF No. 78,
at 19.   In addressing this argument, Norfolk Southern and RailWorks
both focus on one of Norfolk Southern's experts: Dr. Brett Pond.

Dr. Pond's expert report and his opinions contained therein
center on the cause of the Bartow derailment by analyzing the
fractures and the rail around the fractures.   See generally ECF
No. 80-10.   In Dr. Pond's opinion, the thermite welds that
RailWorks performed "were defective," and "the welds at issue
failed because their stress limit was significantly reduced." Id.
at 10.   Dr. Pond's report does not discuss either the standard of
care or customs and practices in the thermite welding industry or
how he believes RailWorks's thermite welding work fell short of
such standard practices.   Put simply, Dr. Pond's report speaks to

causation but not to RailWorks's professional duty or, by extension, its breach of that duty, both of which are necessary elements for proving Norfolk Southern's negligence claim.

Norfolk Southern fails to undermine this conclusion and instead merely argues past it. Norfolk Southern does not point to any portion of Dr. Pond's expert report or deposition testimony that could be read as addressing the relevant standard of care. Instead, Norfolk Southern argues at length that Dr. Pond is generally <u>qualified</u> to testify in this matter and that RailWorks "has established no basis whatsoever to exclude Dr. Pond's opinions."[7]   ECF No. 80, at 7.   But the question before the Court at this juncture is not whether Dr. Pond is qualified to testify regarding the opinions he has been designated to provide in this case; the Court assumes without deciding that he <u>is</u> so qualified for the purpose of summary judgment.

Instead, the Court must address whether the opinions Dr. Pond disclosed during discovery are capable of "establish[ing] the standard of care applicable to" RailWorks's work for Norfolk Southern.   <u>Bilt Rite</u>, 221 Ga. App. at 817, 472 S.E.2d at 710 (citation omitted).   Based on the summary judgment record, which

---

[7] To be sure, RailWorks does assert in the statement of facts portion of its opening brief that Dr. Pond is not "qualified to testify about the forensic analysis of the fractured Bartow rail."   ECF No. 78, at 9.   RailWorks, however, does not raise its assertions regarding Dr. Pond's metallurgy qualifications in the context of its argument that Norfolk Southern has identified no expert capable of testifying regarding the relevant professional standard of care.

includes Dr. Pond's expert report and excerpts of his deposition transcript, the Court agrees with RailWorks that the expert opinion evidence that Dr. Pond would be permitted to offer at trial based on his prior expert disclosures would not establish, or even speak to, the professional standard of care as is necessary to prove a claim for negligent construction under Georgia law.

The Court therefore turns to the second issue: whether the evidence of negligence by RailWorks in this case can be considered "so 'clear and palpable' that it may be understood by [the factfinder] without expert evidence as to a professional standard of care."[8]  Id. (citations omitted).  Bilt Rite provides two examples of cases where a court might find that expert testimony is not required: (1) where "the defendant himself testifies that he should have performed and did perform an act which the evidence shows he did not perform," id. at 818, 472 S.E.2d at 710 (emphasis removed) (quoting Hudgins v. Bacon, 171 Ga. App. 856, 859, 321 S.E.2d 359, 364 (1984)); and (2) where, as in Bilt Rite itself, the defendant failed to follow a manufacturer's specifications when utilizing the manufacturer's product in construction, id. at 818, 472 S.E.2d at 711.  In both of these examples, there could be

---

[8] In its brief in opposition to RailWorks's motion for summary judgment, Norfolk Southern never explicitly argues that this is the sort of case where expert evidence is not needed to establish the professional standard of care, focusing instead on Dr. Pond's qualifications as a metallurgy expert. Nonetheless, to give Norfolk Southern the benefit of the doubt as the non-moving party on this issue, the Court considers whether there is sufficient evidence in the summary judgment record to support that conclusion.

"clear and palpable" evidence of what, specifically, the defendant should have done but negligently failed to do.

Here, however, the Court cannot identify any similar evidence in the summary judgment record that would allow a factfinder to understand the appropriate professional standard of care. Norfolk Southern has not put forth evidence that could support an inference that RailWorks, for example, misused certain equipment or materials necessary to the thermite welding process or missed a necessary step in such process. Even viewing the record evidence in the light most favorable to Norfolk Southern, it would not be possible for the factfinder to discern the applicable standard of care that Norfolk Southern believes RailWorks breached. Absent evidence of how a "competent professional" would perform the thermite welds at issue, the Court "cannot rationally apply negligence principles to [RailWorks's] professional conduct." Id. at 817, 472 S.E.2d at 710 (citation omitted). Therefore, the Court finds that RailWorks has shown that there is insufficient record evidence to support Norfolk Southern's negligence claim and, consequently, grants RailWorks's motion for summary judgment with regard to Count III.[9]

---

[9] RailWorks's opening brief in support of its motion for summary judgement includes the additional argument that summary judgment on Count III is independently appropriate in light of Georgia's "acceptance doctrine." ECF No. 78, at 19 (quoting Thomaston Acquisition, LLC v. Piedmont Constr. Grp., Inc., 306 Ga. 102, 107, 829 S.E.2d 68, 73 (2019)). Norfolk Southern argues in opposition that "a more careful reading of Thomaston confirms that the acceptance doctrine does not apply to claims by the owner or to claims

## E. Count V – Express Indemnity

Norfolk Southern alleges in Count V that, under § 5.1 of the Welding Agreement, RailWorks is required to indemnify Norfolk Southern "for its costs, expenses, damages and fees incurred . . . as a result of or in connection with the Bartow Derailment." ECF No. 1 ¶¶ 125-31. As referenced above, § 5.1 is an indemnification provision that requires RailWorks to indemnify Norfolk Southern "against any and all liability, damages, claims, suits, judgments, costs and expenses . . . , fines, penalties and losses arising out of" either (1) personal injury or property damage due to RailWorks's "negligent acts or omissions or willful misconduct," § 5.1(a)(i)(B), or (2) "any alleged violation of any law, statute, code, ordinance or regulation of the United States or of any state, county or municipal government" resulting from RailWorks's acts or omissions, § 5.1(a)(iii). ECF No. 76-9, at 10-11.

In their summary judgment briefs, both RailWorks's and Norfolk Southern's positions on Count V rely on the arguments they raise in the context of Count III, Norfolk Southern's negligence

---

arising from defects hidden from reasonable inspection." ECF No. 80, at 14. In its reply brief, RailWorks acknowledges that the Georgia Supreme Court has not addressed whether the acceptance doctrine applies where one contracting party sues another for negligent construction and suggests that the Court need not reach this issue at all. ECF No. 82, at 11. Because, as both parties seem to agree, the Georgia Supreme Court has not specifically addressed whether the acceptance doctrine would apply in a case like this one and because summary judgment is appropriate on Count III on an alternate and well-established basis, the Court declines to take up RailWorks's "acceptance doctrine" argument.

claim.   RailWorks argues that, like Count III, Count V fails because Norfolk Southern has not identified an expert to testify regarding "the professional customs applicable to RailWorks'[s] conduct" or "the statutes or other laws governing the Work."  ECF No. 78, at 20.  As discussed in Part III.D supra, Norfolk Southern does not specifically argue that Dr. Pond has opined or will permissibly opine on the relevant professional customs and practices, but rather that Dr. Pond is qualified to offer testimony as an expert in this case, and, consequently, that Norfolk Southern will be able to support each of its claims.  ECF No. 80, at 7-10.  Again as with Count III, RailWorks argues in its reply brief that Norfolk Southern's counterargument fails to point to admissible expert testimony that was timely disclosed in discovery that is capable of establishing the requisite standard of care.[10]

---

[10] RailWorks also argues in its reply brief that summary judgment is appropriate on Count V because, "under Virginia law, a tort action cannot be based solely on a negligent breach of contract," and RailWorks suggests that Norfolk Southern has conceded this argument by failing to offer a response in opposition.  ECF No. 82, at 10 (cleaned up) (quoting Richmond Metro. Auth. v. McDevitt St. Bovis, 256 Va. 553, 559, 507 S.E.2d 344, 347 (1998)).  However, the Court declines to take up this argument given that RailWorks has presented it for the first time in a reply brief (despite RailWorks's suggestion to the contrary), and even then, RailWorks offers no analysis of how the rule from Richmond Metro. Auth. applies to this case's specific facts and claims.  See Cavallo v. Star Enter., 100 F.3d 1150, 1152 n.2 (4th Cir. 1996) (citations omitted).  RailWorks's opening brief does cite to Tingler v. Graystone Homes, Inc., 298 Va. 63, 834 S.E.2d 244 (2019), in which the Virginia Supreme Court analyzed this doctrine at length; but RailWorks only cites Tingler to support the analytically distinct assertion that "a contractor is generally not liable in tort for injuries occurring after the work is accepted by the owner."  ECF No. 78, at 21; see also id. at 19-20 n.9.  Moreover, while Virginia law governs the application of the Welding Agreement's indemnification provision, it is Georgia law, not Virginia law, that governs whether RailWorks owed Norfolk Southern a duty in tort.  Although Georgia appears to follow a similar legal rule, see

Because Norfolk Southern identifies two potential bases for its express indemnity claim, the Court analyzes each in turn. First, because § 5.1(a)(i)(B) generally provides that RailWorks must indemnify Norfolk Southern for losses stemming from RailWorks's <u>negligence</u>, its viability rises and falls with Count III, Norfolk Southern's negligence claim.  For the same reasons discussed at length above, RailWorks has demonstrated that there is insufficient evidence in the record, whether through an expert or otherwise, for Norfolk Southern to establish the applicable professional standard of care as is required to prevail on a negligent construction claim under Georgia law.

In contrast, indemnification under § 5.1(a)(iii) is not grounded in negligence but rather turns on whether Norfolk Southern's losses were due to RailWorks's "violation of any law, statute, code, ordinance or regulation."  RailWorks seems to elide the differences between the two subsections of the indemnification provision, arguing that "[b]oth claims require expert testimony." ECF No. 78, at 20.  RailWorks further argues that, "[j]ust as an ordinary lay juror is not familiar with the professional customs applicable to RailWorks'[s] conduct, such a juror will not be familiar with the statutes or other laws governing the Work." <u>Id.</u>

---

<u>Allstate Ins. Co. v. ADT, LLC</u>, 194 F. Supp. 3d 1331, 1339 (N.D. Ga. 2016), the Court will not attempt to apply it here, given that RailWorks never cited the Georgia standard and, as noted, raised the Virginia version of this argument for the first time in its reply brief.

RailWorks, however, offers no case law or further analysis to
support its assertion Norfolk Southern is required to put on an
expert to testify regarding "the statutes and other laws governing
the Work." Unlike the more intangible concept of custom and
practice within a particular industry, statutes and regulations
are expressly written to define publicly what conduct does or does
not violate the law. Moreover, the trial in this case will be a
<u>bench</u> trial, not a jury trial, eliminating any lingering concern
RailWorks otherwise may have had regarding the factfinder's
ability to interpret any applicable legal standards.

Therefore, the Court grants summary judgment to RailWorks on
Count V to the extent the claim is grounded in § 5.1(a)(i)(B) but
denies summary judgment on Count V to the extent it is grounded in
§ 5.1(a)(iii) as RailWorks has failed to carry its burden of
proving that there is insufficient record evidence to support that
portion of Norfolk Southern's express indemnity claim.

### F. Count VII – Contribution

Following the Bartow derailment, "[h]undreds of persons"
asserted property damage and personal injury claims and demands
against Norfolk Southern, and Norfolk Southern entered into
settlement agreements with these persons without admitting
liability. ECF No. 1 ¶¶ 139-41. In Count VII, Norfolk Southern
alleges that, "because RailWorks was negligent with respect to its
preparation and performance of the broken/failed thermite weld

that caused the Bartow Derailment" and "failed to prepare and perform [that weld] . . . in accordance with the terms [o]f the Welding [Agreement]," Norfolk Southern "is entitled to common law and/or statutory contribution from RailWorks under applicable law for all or a portion of the amount of the settlements." Id. ¶¶ 142-43.

Under both Virginia and Georgia law,[11] contribution is a statutory cause of action. See Va. Code Ann. § 8.01-34; Ga. Code Ann. § 51-12-32. As the Virginia Supreme Court has explained, "contribution lies where two or more persons are liable to pay a claim and one or more of them pays the whole of it, or more than his or her share, [and] the one so paying may generally recover from the others the ratable proportion of the claim that each ought to pay." Safeway, Inc. v. DPI Midatlantic, Inc., 270 Va. 285, 289 n.6, 619 S.E.2d 76, 79 n.6 (2005) (internal quotation marks and citations omitted); see also Deaton Holdings, Inc. v. Reid, 367 Ga. App. 746, 748, 888 S.E.2d 333, 335 (2023) ("It is well-settled that a tortfeasor has a substantive right of contribution from other joint tortfeasors who were not sued in the action.").

---

[11] As RailWorks notes, ECF No. 78, at 21 n.11, it is not readily clear which state's law governs Count VII because, although contribution requires an underlying tort claim, it is also an equitable claim based on a theory of implied contract. See, e.g., Powell v. Barker, 96 Ga. App. 592, 596, 101 S.E.2d 113, 116-17 (1957). However, regardless of which state's law applies to the contribution claim itself, RailWorks's summary judgment argument on Count VII focuses on the underlying negligence claims to which Georgia law applies.

Looking to the Complaint, Count VII is grounded in the same basic negligence allegations underpinning Count III.[12]   By extension, for the same reasons discussed at length above with regard to Count III and a portion of Count V, the viability of Count VII rises and falls with Count III, and RailWorks has demonstrated that there is insufficient record evidence for Norfolk Southern to establish the applicable professional standard of care as is required to prevail on a negligent construction claim under Georgia law.   The Court therefore grants summary judgment to RailWorks on Count VII.

## G. Count IX - Implied Indemnity

Count IX of Norfolk Southern's Complaint alleges that Norfolk Southern "is entitled to implied indemnity from RailWorks with respect to all losses, expenses, costs and damages incurred in connection with the Bartow Derailment" because the derailment was entirely caused by RailWorks's acts or omissions and RailWorks would be "unjustly enriched" if it did not "fully indemnify" Norfolk Southern.   ECF No. 1 ¶¶ 149-54.   In its opening brief,

---

[12] The Complaint alleges: "RailWorks was responsible for the injuries and damage arising from the Bartow Derailment because RailWorks was negligent with respect to its preparation and performance of the broken/failed thermite weld that caused the Bartow Derailment, and because RailWorks failed to prepare and perform the broken/failed thermite weld that caused the Bartow Derailment in accordance with the terms if [sic] the Welding [Agreement] and the warranties contained in the Welding [Agreement]."   ECF No. 1 ¶ 142.   Although the second clause of this statement purports to rely on RailWorks's failure to comply with the terms of the Welding Agreement, the cause of action of contribution requires proof of a tort and cannot be predicated on a breach of contract.

RailWorks argues that it is entitled to summary judgment on this implied indemnity count because "[c]ourts applying Virginia law have repeatedly rejected claims for implied indemnity where the parties agreed to an express indemnity provision." ECF No. 78, at 22. In its opposition brief, Norfolk Southern offers no contrary argument or case law in support of its implied indemnity count and instead states that it "does not intend to continue to pursue a claim for implied indemnity in this case." ECF No. 80, at 16 n.7.

Given the express indemnity provision in the Welding Agreement, the Court agrees with RailWorks that Count IX is not viable under Virginia law. See Dacotah Mktg. & Rsch., LLC v. Versatility, Inc., 21 F. Supp. 2d 570, 580 (E.D. Va. 1998) ("Principles of implied indemnity do not operate in the face of an express indemnification contract." (citing Fidelity & Deposit Co. of Md. v. Bristol Steel & Iron Works, Inc., 722 F.2d 1160, 1163 (4th Cir. 1983)). Moreover, in light of Norfolk Southern's decision not to pursue such claim, RailWorks's well-founded legal argument stands unrebutted, and the Court finds that RailWorks is entitled to summary judgment as a matter of law on Count IX.

### H. Certain Damages

RailWorks also asks the Court to grant summary judgment in its favor regarding certain categories of Norfolk Southern's claimed damages. As the plaintiff, Norfolk Southern bears the burden "of proving with reasonable certainty the amount of damages

and the cause from which they resulted." <u>Manchester Oaks
Homeowners Ass'n, Inc. v. Batt</u>, 284 Va. 409, 423, 732 S.E.2d 690,
699 (2012) (quoting <u>Shepherd v. Davis</u>, 265 Va. 108, 125, 574 S.E.2d
514, 524 (2003)). Although carrying this burden does not require
"[p]roof with mathematical precision," it does require Norfolk
Southern "to furnish evidence of sufficient facts and
circumstances to permit the fact-finder to make at least an
intelligent and probable estimate of the damages sustained." <u>Id.</u>
(quoting <u>Dillingham v. Hall</u>, 235 Va. 1, 4, 365 S.E.2d 738, 739
(1988)). "Damages based on uncertainties, contingencies, or
speculation cannot be recovered." <u>Id.</u> (quoting <u>Shepherd</u>, 265 Va.
at 125, 574 S.E.2d at 524).

RailWorks challenges the sufficiency of Norfolk Southern's
evidence with respect to claimed damages arising from:
(1) destroyed or damaged railcars; (2) lost lading; (3) municipal
and third-party invoices; (4) Norfolk Southern's derailment
expenses; (5) third-party settlements; (6) attorneys' fees and
costs incurred in defending and settling third-party claims; and
(7) pre-judgment interest. The Court considers each of these
categories in turn.

### 1. Destroyed or Damaged Railcars

Norfolk Southern seeks approximately $1.8 million dollars for
31 destroyed railcars and approximately $260,000 for repairs to
damaged railcars. RailWorks argues that summary judgment is

appropriate as to both of these categories of damages because Norfolk Southern has provided insufficient evidence to prove the damages to a reasonable degree of certainty. ECF No. 78, at 24-25. The parties offer a variety of highly fact-specific arguments grounded in their respective valuations and expert reports. However, the Court need not rehash those arguments here because it concludes that, across the board, these arguments highlight the existence of disputed issues of material fact. RailWorks therefore has not carried its burden of demonstrating that it is entitled to summary judgment on this item of damages.

## 2. Lost Lading

Norfolk Southern seeks approximately $100,000 in damages for lading lost from two shipments due to the Derailment. ECF No. 78-17, at 1. RailWorks initially argued in its opening brief that it is entitled to summary judgment on this category of damages because Norfolk Southern has not provided evidence that: (1) the relevant shipments were actually damaged or lost due to the Derailment; (2) the claimed damaged/lost shipments were properly valued by their respective owners; or (3) Norfolk Southern actually paid one of the two shipment owners for the lost lading. However, after Norfolk Southern highlighted responsive evidence supporting its lost lading claim in its opposition brief, RailWorks has modified its position in its reply brief to argue that Norfolk Southern has failed to provide evidence of: "(1) the materials which were

actually paid for as lost lading and (2) [Norfolk Southern]'s review of th[e shipment] owners' assessment of the materials." ECF No. 82, at 13.

After reviewing Norfolk Southern's proffered evidence in the light most favorable to Norfolk Southern, the Court finds that there is sufficient evidence to withstand summary judgment. RailWorks's revised arguments speak to the persuasiveness of Norfolk Southern's evidence for this category of damages, which is an issue for trial, rather than convincing the Court that Norfolk Southern cannot "prov[e] with reasonable certainty the amount of damages and the cause from which they resulted." Manchester Oaks, 284 Va. at 423, 732 S.E.2d at 699 (citation omitted). The Court therefore denies RailWorks's motion for summary judgment as to this category of damages.

### 3. Municipal and Third-Party Invoices

Norfolk Southern seeks approximately $14,700 for payments that it asserts it made to local municipalities and to a third party, Civicus Media LLC. ECF No. 78-16, at 6; ECF No. 78-17, at 1. RailWorks argues that it is entitled to summary judgment on this category of damages because (1) Norfolk Southern failed to produce any evidence of its claimed $3,186 payment to Civicus and (2) Norfolk Southern failed to produce evidence that it "verified" the accuracy of the municipal invoices (by verifying that the first responders were present and performed services and that the hours

each first responder claimed to have worked were accurate) or that Norfolk Southern actually paid those invoices. ECF No. 78, at 26.

Although Norfolk Southern asserts in its opposition brief that it "has produced the invoice" supporting the Civicus payment, ECF No. 80, at 19, RailWorks represents in its reply that this invoice was not produced until April 17, 2023, <u>after</u> the close of discovery, including the period for taking depositions, and <u>after</u> the deadline for filing dispositive motions, ECF No. 82, at 13.[13] In light of this unacknowledged and unexplained lateness, the Court exercises its discretion under Rule 37(c)(1) of the Federal Rules of Civil Procedure to refuse to consider the Civicus invoice.

The Court arrives at a different conclusion here than it does on Norfolk Southern's Rule 37 argument regarding RailWorks's misuse experts because, unlike RailWorks, Norfolk Southern has not argued that its delay was either justified or harmless. Furthermore, given that the Civicus invoice was produced approximately <u>ten months</u> after the claimed payment was identified in Norfolk Southern's Rule 26(a)(1) disclosures and that, consequently, RailWorks did not have the benefit of the records

---

[13] This representation is not contradicted by anything in Norfolk Southern's opposition brief, which does not specify when the Civicus invoice was produced, nor has Norfolk Southern made any effort in the time since RailWorks filed its reply brief to contradict RailWorks's recitation of the timeline. Therefore, the Court relies on this representation by RailWorks's counsel, as officers of the Court, but the Court could reconsider its ruling on the Civicus invoice if it is suggested at a later date that this evidence in fact <u>was</u> produced before the close of discovery.

when taking depositions or drafting its motion for summary judgment, it is difficult for the Court to see how it could conclude the delay was justified or harmless, even if Norfolk Southern had made such an argument. To the Court's knowledge, there is no other record evidence supporting the Civicus payment. The Court therefore concludes that RailWorks is entitled to summary judgment as a matter of law as to the $3,186 Civicus payment.

However, RailWorks has not similarly carried its burden with respect to the claimed payments to municipalities. RailWorks argues that Norfolk Southern's evidence — which includes testimony from John Fletcher, a member of Norfolk Southern's claims department who was present at the Derailment site — is insufficient because it does not demonstrate that Norfolk Southern verified that the first responders were present, that they performed services, that the hours they claimed were accurate, or that the invoices were paid. Yet, RailWorks does not cite any support, whether through case law or testimony from its experts, corroborating its assertion that, without all of these additional pieces of evidence, Norfolk Southern cannot "prov[e] with reasonable certainty the amount of damages and the cause from which they resulted." Manchester Oaks, 284 Va. at 423, 732 S.E.2d at 699 (citation omitted). The Court concludes that there remain disputed issues of material fact as to the claimed payments to

municipalities and therefore denies RailWorks's motion for summary judgment as to this category of damages.

### 4. Norfolk Southern's Derailment Expenses

Norfolk Southern claims approximately $2.5 million in damages for costs it incurred internally in responding to the Derailment. This category includes various subcategories that Norfolk Southern describes in its Rule 26(a)(1) disclosures as "NS Labor," "NS Non-Contract Labor," "NS Material," "NS Miscellaneous Expenses," "NS Services," "NS Misc. Services/Adjustments," and "NS Meals and Travel." ECF No. 78-16, at 6-7; ECF No. 78-17, at 1-2. RailWorks argues for a variety of reasons that it is entitled to summary judgment on each of these subcategories. Although the Court does not address each of these arguments individually, it has considered them all and concludes that none of them is persuasive. RailWorks asserts that Norfolk Southern has failed to produce numerous types of evidence that RailWorks argues are necessary to proving these various subcategories of Norfolk Southern's Derailment expenses. But, across the board, RailWorks provides no case law or legal argument to support its positions. The Court is mindful that proof of damages does not require "[p]roof with mathematical precision," and RailWorks has not carried its burden of demonstrating that Norfolk Southern does not have "evidence of sufficient facts and circumstances to permit the fact-finder to make at least an intelligent and probable estimate of the damages sustained."

Manchester Oaks, 284 Va. at 423, 732 S.E.2d at 699 (citation omitted). Therefore, the Court denies RailWorks's motion for summary judgment as to the damages Norfolk Southern claims it incurred in responding to the Derailment.

### 5. Third-Party Settlements

RailWorks seeks summary judgment on Norfolk Southern's claim for costs it incurred in settling third-party claims, arguing that Norfolk Southern's decision to "pay hundreds of thousands of dollars to individuals living several miles from a derailment cannot be considered a direct damage, nor is it a consequential damage reasonably contemplated by the parties at the time of contracting, and is too remote . . . to be assessed against RailWorks." ECF No. 78, at 28-29. Norfolk Southern argues that its payments to third parties are compensable because Norfolk Southern made these payments "to residents who provided sufficient documentation of residence in the evacuation zone" established by the emergency responders because the Derailment "involved the release of hazardous materials." ECF No. 80, at 21.

Although RailWorks asserts that these payments are not compensable as either direct or consequential damages, neither party grapples with this legal issue in any meaningful way. As the Virginia Supreme Court has explained:

> There are two broad categories of contract damages: direct damages and consequential damages. Direct damages are those that flow "naturally" from a breach of

contract; i.e., those that, in the ordinary course of
human experience, can be expected to result from the
breach, and are compensable. Consequential damages
arise from the intervention of "special circumstances"
not ordinarily predictable and are compensable only if
it is determined that the special circumstances were
within the contemplation of the parties to the contract.
Whether damages are direct or consequential is a
question of law. The determination whether special
circumstances were within the parties' contemplation is
a question of fact for a [factfinder].

R.K. Chevrolet, Inc. v. Hayden, 253 Va. 50, 56, 480 S.E.2d 477,
481 (1997) (citations omitted). As the moving party, RailWorks
bears the burden of convincing the Court that: (1) as a legal
matter, these are not direct damages; and (2) there is insufficient
record evidence for Norfolk Southern to prove at trial that these
damages were within the parties' contemplation at the time they
entered into the Welding Agreement. But RailWorks cites only one
case in support of its positions and does so only for that
opinion's explanation of the difference between direct and
consequential damages. Without more, RailWorks fails to convince
the Court that summary judgment is appropriate.

Further, it is not, as RailWorks seems to suggest, Norfolk
Southern's burden at this time to have "proven that RailWorks'[s]
welds caused the Bartow derailment [such that] those payments [to
third parties would] be a natural consequence of the Welding
Agreement." ECF No. 82, at 15. As discussed at length above,
there remains a question of material fact on that issue.
Therefore, the Court finds that RailWorks has not carried its

burden and denies its motion for summary judgment as to this
category of claimed damages.

### 6. Attorneys' Fees and Costs for Third-Party Claims

Norfolk Southern seeks approximately $750,000 in attorneys'
fees and costs associated with defending and settling claims
brought against it by third parties as a result of the Derailment.
ECF No. 78-16, at 7; ECF No. 78-17, at 3; see also ECF No. 80, at
22 (describing the claimed fees and costs as "attorney's fees spent
in defending cases filed against [Norfolk Southern] because of the
derailment"). RailWorks argues that it is entitled to summary
judgment as to these claimed attorneys' fees and costs because
Norfolk Southern "has not produced any evidence of these damages,"
and because, even if it had produced such evidence, Norfolk
Southern has not designated an expert regarding the reasonableness
of those fees. ECF No. 78, at 29 (emphasis in original).

Norfolk Southern counters that, as to the first argument, it
"has produced detailed time records of the attorney's fees it
incurred," and, as to the second argument, it "anticipates
eliciting testimony from counsel involved with [] representing
[Norfolk Southern] in the immediate aftermath and during
subsequent litigation that the fees were reasonable," which is
"sufficient to remove the tradition[al] requirement of expert
testimony." ECF No. 80, at 22. In its reply, RailWorks highlights
that: (1) although expert testimony is not always required,

"Virginia case law is replete with instances where expert testimony is <u>ordinarily</u> required"; (2) Norfolk Southern "did not produce any of the time records it references until April 17, 2023, after the close of discovery and the deadline for filing dispositive motions"; and (3) Norfolk Southern "declined to produce a witness to testify regarding its claim for attorneys' fees in response to RailWorks'[s] deposition notice" and instead intends to have "one of its counsel of record [in this case] testify at trial as to the reasonableness of the fees incurred in investigating the Bartow derailment and the third-party claims."[14]   ECF No. 82, at 16-17 (emphasis in original).

The Court need not address whether expert testimony would be necessary here to establish the reasonableness of the claimed attorneys' fees and costs because Norfolk Southern's failure to produce any evidence of those fees and costs in a timely manner is dispositive. Proof of these damages is part of Norfolk Southern's <u>prima facie</u> case, and although it included a valuation of this category of damages in its June 2022 Rule 26(a)(1) disclosures, ECF No. 78-16, Norfolk Southern provided no supporting evidence

---

[14] Like RailWorks's representation regarding the Civicus invoice, these representations are not contradicted by anything in Norfolk Southern's opposition brief, nor has Norfolk Southern made any effort in the time since RailWorks filed its reply brief to contradict RailWorks's representations. Therefore, the Court relies on these representations by RailWorks's counsel, as officers of the Court, but the Court could reconsider its ruling on the category of damages if it is suggested at a later date that these representations are inaccurate.

for that valuation until April 17, 2023, after the deadlines for the close of discovery and the filing of dispositive motions. Significantly, it was only _after_ RailWorks filed its motion for summary judgment on April 13, 2023, arguing that Norfolk Southern had provided no supporting evidence, that Norfolk Southern produced such documentation.[15]

Consistent with the Court's ruling on the Civicus invoice, the Court exercises its discretion under Rule 37(c)(1) of the Federal Rules of Civil Procedure to refuse to consider the time records that Norfolk Southern produced after the close of discovery in light of its unacknowledged and unexplained lateness in producing these records. For the same reasons discussed above, it does not appear that the Court could conclude that the delay was justified or harmless, even if Norfolk Southern had made such an argument.[16]

Without any evidence to support Norfolk Southern's claim for attorneys' fees and costs associated with the Derailment and the related third-party settlements, the Court concludes that

---

[15] In its First Set of Interrogatories and Request for Production of Documents, dated October 28, 2022, RailWorks requested that Norfolk Southern produce "[a]ny documentation supporting the claimed damages incurred by [Norfolk Southern] in connection with the [D]erailment[]." ECF No. 78-18, at 12.

[16] Moreover, unlike the Civicus invoice, Norfolk Southern did not attach the late-produced time records to its opposition brief, meaning that the Court has no access to those records even if it were inclined to review them.

RailWorks has carried its burden and is entitled to summary judgment as a matter of law on this category of claimed damages.[17]

### 7. Prejudgment Interest

In its Complaint, Norfolk Southern seeks an award of "prejudgment and post-judgment interest on all money damages" that might be awarded to it in this action. ECF No. 1, at 32. RailWorks argues that the Court should grant summary judgment in RailWorks's favor on Norfolk Southern's claim for prejudgment interest because Norfolk Southern's "damages remain unliquidated and are disputed." ECF No. 78, at 30. In opposition, Norfolk Southern emphasizes that whether to award prejudgment interest is at the discretion of the trier of fact and that Norfolk Southern's claimed damages "are not abstract, like emotional distress damages, but are based on concrete expenses." ECF No. 80, at 22-23.

"Virginia law governs the award of prejudgment interest in a diversity case." Hitachi Credit Am. Corp. v. Signet Bank, 166 F.3d 614, 633 (4th Cir. 1999) (citation omitted). Section 8.01-

---

[17] RailWorks argues in a footnote in its reply brief that "the Court should deny [Norfolk Southern] any right to recover its attorneys' fees" for the instant litigation because Norfolk Southern's "only right to recover fees is under the indemnity clause in Section 5.1 of the Welding Agreement" and summary judgment is appropriate on Norfolk Southern's express and implied indemnity counts. ECF No. 82, at 18 n.11. However, while the Court grants summary judgment on the implied indemnity claim and on part of the express indemnity claim, part of the express indemnity claim survives RailWorks's motion for summary judgment. The Court thus expresses no opinion regarding Norfolk Southern's ability in the future to recover attorney's fees incurred in connection with this action.

382 of the Virginia Code provides for prejudgment interest as
follows:

> In any . . . action at law or suit in equity, the final
> order, verdict of the jury, or if no jury the judgment
> or decree of the court, may provide for interest on any
> principal sum awarded, or any part thereof, and fix the
> period at which the interest shall commence.

Va. Code Ann. § 8.01-382.   As Norfolk Southern argues, "the
decision whether to award pre-judgment interest is discretionary
with the trier of fact."  Upper Occoquan Sewage Auth. v. Blake
Const. Co., 275 Va. 41, 63, 655 S.E.2d 10, 23 (2008).   Where, as
here, the court is the trier of fact, the issue of prejudgment
interest is "submitted to the sound discretion of the trial court."
Advanced Marine Enters., Inc. v. PRC Inc., 256 Va. 106, 126, 501
S.E.2d 148, 160 (1998).

Although RailWorks is correct that Virginia courts generally
do not grant prejudgment interest on "unliquidated damages in
dispute between the parties,"[18] id. (citations omitted), granting
summary judgment on that basis alone would be premature.   The
language of § 8.01-382 — which references "the final order, verdict
of the jury, or if no jury the judgment or decree of the court"
(emphases added) — indicates that a trier of fact is generally
expected to consider prejudgment interest only after it has
resolved some or all of the plaintiff's claims in its favor,

---

[18] The damages Norfolk Southern seeks here are "unliquidated" because they
are based on a calculation of loss suffered by Norfolk Southern and are not
proactively contemplated by the Welding Agreement.

typically at the conclusion of the trial. While the Court's review of prior cases applying Virginia law reveals that <u>plaintiffs</u> sometimes <u>seek</u> prejudgment interest as part of dispositive motions for summary judgment, the Court has been unable to identify any instances where a court applying Virginia law has granted (or even considered) a private <u>defendant's</u>[19] motion for summary judgment seeking a dispositive pretrial ruling that, because the plaintiff's damages are unliquidated, the plaintiff <u>cannot</u> recover prejudgment interest should it ultimately prevail at trial. <u>See, e.g.</u>, <u>Reid v. Ayscue</u>, 246 Va. 454, 459, 436 S.E.2d 439, 442 (1993) (affirming the trial court's decision to grant summary judgment on the plaintiffs' contribution claim but to deny prejudgment interest); <u>City Nat'l Bank v. Tress</u>, No. 7:11cv73, 2013 WL 3879689, at *5 (W.D. Va. July 26, 2013) (granting the plaintiff's motion for summary judgment and ordering the defendant to pay damages, including prejudgment interest).

As the Virginia Supreme Court has explained, the purpose of awarding prejudgment interest is:

---

[19] Where appropriate, a court applying Virginia law will grant summary judgment to a <u>public</u> defendant on the availability of prejudgment interest because of "the common-law principle of state immunity from interest charges in the absence of [a] statutory or contract obligation." <u>Halco Eng'g, Inc. v. Commonwealth</u>, 27 Va. Cir. 111, 1992 WL 884473, at *3 (Fairfax County 1992) (citing <u>Highway Comm'r. v. Parsonage Trustees</u>, 220 Va. 402, 258 S.E.2d 503 (1979); <u>City of Lynchburg v. Amherst Cnty.</u>, 115 Va. 600, 80 S.E. 117 (1913)). In those cases, unlike this one, the factfinder does <u>not</u> have discretion to award prejudgment interest because the defendant cannot be required to pay prejudgment interest as a matter of law.

to compensate [the p]laintiff for the loss sustained by
not receiving the amount to which he was entitled at the
time he was entitled to receive it, and such award is
considered necessary to place the [plaintiff] in the
position he would have occupied if the party in default
had fulfilled his obligated duty.

Marks v. Sanzo, 231 Va. 350, 356, 345 S.E.2d 263, 267 (1986)

(second alteration in original) (quoting Emp.-Teamsters Joint

Council No. 84, Health & Welfare Fund v. Weatherall Concrete, Inc.,

468 F. Supp. 1167, 1171 (S.D.W. Va. 1979)). Thus, courts seek to

"weigh the equities in a particular case to determine whether an

award of prejudgment interest is appropriate."[20] Moore Bros. Co.

v. Brown & Root, Inc., 207 F.3d 717, 727 (4th Cir. 2000).

Attempting to conduct this analysis on summary judgment would be

premature; the Court will be far better placed to decide whether

to award prejudgment interest at the close of trial, once the

parties have presented their evidence in full and the Court has

determined whether Norfolk Southern should prevail on its damages

claims. Therefore, the Court denies RailWorks's motion for summary

judgment as to the issue of prejudgment interest.

---

[20] For example, courts consider factors such as: whether "a legitimate
controversy existed," Reid, 246 Va. at 459, 436 S.E.2d at 442; whether the
amount of damages and the length of time the plaintiff "has been without
their benefit are significant," Wells Fargo Equip. Fin., Inc. v. State Farm
Fire & Cas. Co., 823 F. Supp. 2d 364, 368 (E.D. Va. 2011); and, as noted
above, whether the damages are "unliquidated" and "in dispute," Advanced
Marine, 256 Va. at 126, 501 S.E.2d at 160 (1998) (citations omitted). To
be clear, however, there is no "bona fide legal dispute exception" to § 8.01-
382. See Gill v. Rollins Protective Servs. Co., 836 F.2d 194, 199 (4th Cir.
1987). The factfinder retains its discretion to grant prejudgment interest
even where the dispute between the parties is legitimate.

## IV. CONCLUSION

For the reasons set forth above, the Court **DENIES** Norfolk Southern's motion for partial summary judgement, ECF No. 75, and **GRANTS in part** and **DENIES in part** RailWorks's motion for summary judgment, ECF No. 77. The Court **GRANTS** RailWorks's motion as to Counts III, VII, and IX. The Court also **GRANTS** RailWorks's motion as to Count V to the extent it is based on § 5.1(a)(i)(B) of the Welding Agreement but **DENIES** RailWorks's motion as to Count V to the extent it is based on § 5.1(a)(iii) of the Welding Agreement. The Court **DENIES** RailWorks's motion as to Count I. Regarding RailWorks's damages-based arguments, the Court **GRANTS** RailWorks's motion as to the following categories of damages claimed by Norfolk Southern: (1) the payment to Civicus Media LLC; and (2) attorneys' fees and costs for third-party claims. Otherwise, the Court **DENIES** RailWorks's motion as to Norfolk Southern's damages claims.

The Clerk is **REQUESTED** to send a copy of this Opinion and Order to all Counsel of Record.

**IT IS SO ORDERED.**

/s/ Mark

Mark S. Davis
CHIEF UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
September 14, 2023